Tarek H. Zohdy (SBN 247775)
Tarek.Zohdy@capstonelawyers.com
Cody R. Padgett (SBN 275553)
Cody.Padgett@capstonelawyers.com
Capstone Law APC
1875 Century Park East, Suite 1000
Los Angeles, California 90067
Telephone:   (310) 556-4811
Facsimile:   (310) 943-0396
*Additional Counsel on Signature Page*
Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHERYL TAVARES, PAULO TAVARES, and CHARLES DEFFENDALL individually, and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>TOYOTA MOTOR SALES, U.S.A., INC., a California corporation, TOYOTA MOTOR NORTH AMERICA, INC., a California corporation, and TOYOTA MOTOR CORPORATION, a Japanese corporation,<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>(1) Fraud and/or Fraudulent Omission<br>(2) Violations of California's Consumers Legal Remedies Act<br>(3) Viol. of Unfair Competition Law<br>(4) Breach of Implied Warranty under the Song-Beverly Consumer Warranty Act<br>(5) Breach of Express Warranty under California Law<br>(6) Violation of Texas Deceptive Trade Practices-Consumer Protection Act<br>(7) Breach of Implied Warranty under Texas Law<br>(8) Breach of Express Warranty under Texas Law<br>(9) Breach of Written Warranty under the Magnuson-Moss Warranty Act<br>(10) Breach of Implied Warranty under the Magnuson-Moss Warranty Act<br><br>**DEMAND FOR JURY TRIAL** |

1.     Plaintiffs Cheryl Tavares, Paulo Tavares, and Charles Deffendall ("Plaintiffs") bring this action for themselves and on behalf of all persons ("Class Members") in the United States, and in the alternative on behalf of all persons in the states of California and Texas, who purchased or leased any model year 2020 to 2021 Toyota Highlander equipped with a hybrid powertrain ("Class Vehicles").

2.     Defendants Toyota Motor Sales, U.S.A., Inc., ("TMS") Toyota Motor North America, Inc., ("TMNA,") and Toyota Motor Corporation ("TMC") (collectively, "Toyota" or "Defendants") designed, manufactured, marketed, distributed, sold, warranted, and/or serviced the Class Vehicles. Plaintiffs allege as follows:

## INTRODUCTION

3.     This is a consumer class action concerning the misrepresentation of material facts, the failure to disclose material facts, and safety concerns to consumers.

4.     Defendants manufactured, marketed, distributed, and sold the Class Vehicles without disclosing that the Class Vehicles' fuel systems are defective.

5.     The Class Vehicles are equipped with and advertised as having 17.1 gallon fuel tanks, and able to achieve 36 miles per gallon ("MPG") for city driving, 35 MPG for highway driving, and 36 MPG for combined driving.[1]  This provides a range of approximately 615 miles on a single tank of gas.

| ✓ Standard  ○ Available<br>— Not Available | **Hybrid LE**<br>AWD 2.5L 4-Cyl. ECVT Hybrid | **Hybrid XLE**<br>AWD 2.5L 4-Cyl. ECVT Hybrid | **Hybrid Limited**<br>AWD 2.5L 4-Cyl. ECVT Hybrid |
|---|---|---|---|
| — COLLAPSE ALL | CHANGE MODEL \| BUILD | CHANGE MODEL \| BUILD | CHANGE MODEL \| BUILD |
| Fuel tank (gal.) | 17.1 | 17.1 | 17.1 |

[1] *See* https://www.toyota.com/highlanderhybrid/ (last visited May 25, 2021).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**FIGURE 1**

6.      Based on publicly available information, counsel's investigations, and Plaintiffs' own experiences, Plaintiffs allege that the Class Vehicles are defective in design, manufacture, materials and/or workmanship in that the fuel tank cannot be filled to its advertised capacity, compromising the promised driving range of the vehicles, increasing emissions and increasing the risk of overflow during fueling (the "Fuel Tank Defect" or "Defect").

7.      The Fuel Tank Defect is inherent in each Class Vehicle and was present at the time of sale or lease to each Class Member.

8.      Toyota designed and manufactured the fuel systems in the Class Vehicles, which are part of a hybrid power design such that the vehicle is powered by a 2.5 liter gasoline engine as well as electric motors.  Originally introduced at the 2004 North American International Auto Show, the Toyota Highlander Hybrid first went on sale in the United States with the 2005 model year.  Starting in 2019, Toyota introduced the re-designed fourth generation Highlander Hybrid, which "claims 34 mpg(!) in combined driving," a significant increase from the third generation's 28 MPG.[2]

9.      Toyota continued to tout these improvements in its fourth-generation Highlander Hybrid in subsequent press releases, trumpeting, "Leave it to Toyota to again raise the bar for hybrid SUV functionality by making the 2020 model the most fuel-efficient Highlander Hybrid ever."[3] It went on to state:

> The bottom line is an eye opener for the efficiency-minded: 243 total system horsepower and up to a

[2] Collins, Andrew P., "The 2020 Toyota Highlander Hybrid gets 34 MPG and a Big New Touchscreen," Jalopnik.com, available at https://jalopnik.com/the-2020-toyota-highlander-hybrid-gets-34-mpg-and-a-big-1834099847 (April 17, 2019) (last visited May 25, 2021).

[3] *See* "Toyota's Fourth Generation 2020 Highlander Redesigned from the Ground Up," Toyota NewsRoom, available at https://pressroom.toyota.com/toyotas-fourth-generation-2020-highlander-redesigned-from-the-ground-up/ (Dec. 18, 2019) (last visited June 8, 2021).

manufacturer-estimated 36 combined MPG. The latter is a 24-percent improvement over the previous-generation Highlander Hybrid's 29 combined MPG.

10. On February 6, 2020, at the Chicago Auto Show, Toyota's Group Vice President of Toyota Marketing, Ed Laukes, highlighted the Highlander Hybrid's fuel efficiency and driving range, stating, "Hybrid best in class in fuel economy and over 600 miles in range? Check and check. Now, 600 miles? That's enough to get from here [Chicago] to – I guess pretty much anywhere that's warm. So even though Highlander has only been out for a month, we're already taking it to the next level."[4]

11. Toyota's authorized dealerships, which are sole and exclusive sellers of Toyota's new vehicles to consumers and whose advertising statements are tightly controlled by Toyota, repeat these claims of fuel economy and ability to drive long distances. One dealership advertises as follows:[5]

## Travel Far and Wide with the Highlander



Thanks to a 17.9-gallon tank on the gas model, the 2021 Toyota Highlander can travel nearly **520 highway miles** on a full tank of gas. This means you can run your kids to their after-school activities or even take a weekend camping trip, all without stopping often at the pump.

Usually, in hybrid models, the gas tank is significantly smaller to accommodate the battery. However, in the Highlander hybrid, you'll be treated to a 17.1-gallon tank. When full, you can expect to journey over **615 city miles** before needing to refuel.

12. Another dealership tells consumers, "If . . . you're hoping to maximize fuel efficiency, opt for the hybrid motor. The available 2.5-liter Atkinson Cycle engine is combined with an electric motor to earn an EPA-

---

[4] "2021 Toyota Highlander Hybrid Unveiling," Chicago Auto Show, February 6, 2020 available at https://www.youtube.com/watch?v=K8Ur8HFRwAg at 4:19 (last visited June 8, 2021).

[5] https://www.toyotagallatin.com/toyota-highlander-mpg-review-gallatin-tn.html (last visited June 8, 2021).

1  estimated 36 MPG city and 35 MPG highway, so you can stay on the road

2  longer."[6]

3     13.   In the fourth generation hybrid versions of the Highlander, Toyota

4  employed its "new-generation Toyota Hybrid System," using "a high-efficiency

5  2.5-liter DOHC four-cylinder engine with two electric motors."[7]  As described

6  by Toyota, "[t]he transaxle mounts the electric motors (MG1 and MG2)

7  coaxially rather than in-line."[8]  This design change necessitated that Toyota re-

8  design a number of internal components in order to accommodate the layout of

9  the hybrid system.  One of the re-designed pieces was the fuel tank assembly

10  ("fuel tank").

11     14.   Since its introduction, this redesigned Highlander Hybrid has been

12  the subject of hundreds of complaints by consumers, who have been unable to

13  fill up their vehicles to the advertised capacity of 17.1 gallons.   When refueling,

14  consumers report that the automatic shut-off activates well before the tank is full,

15  usually after a mere 12-14 gallons have been added to an empty tank.

16  Consumers can attempt to force the tank to accept  more fuel by slowly adding

17  gas after the automatic shut-off has been triggered, but many have reported gas

18  then spilling out of the vehicle well before the tank has actually been filled to the

19  advertised capacity of 17.1 gallons.  Even in those situations, the gas gauge in

20  Class Vehicles rarely reads full and the computed Distance to Empty ("DTE") is

21  usually well below the expected 615-mile range.

22     15.   The Fuel Tank Defect presents a safety risk for Plaintiffs, members

23  of the Class, and the general public because, discovery will show, the fuel

24  _____

  [6]https://www.thompsontoyota.com/toyota-highlander-research-edgewood-md.htm (last visited June 8, 2021).

25

26  [7] *See* "World Premiere of All-New 2020 Highlander  at New York International Auto Show," Toyota NewsRoom, available at https://pressroom.toyota.com/world-premiere-of-all-new-2020-highlander-at-new-york-international-auto-show/ (April 17, 2019) (last visited May 25, 2021).

27

28  [8] *Id.*

systems in Class Vehicles are not properly vented, leading to increased emissions from the car, damaging the fuel system components due to higher internal pressure, and increasing the risk of fuel spilling out of the vehicle while being re-fueled.

16.     This hazardous defect has resulted in numerous complaints to authorized dealers throughout the country and to the National Highway Traffic Safety Administration ("NHTSA") for vehicles that only began to be sold in February 2020.  As one frustrated 2021 Highlander Hybrid owner from Banks, Oregon (NHTSA ID Number: 11385688) reported to NHTSA on December 30, 2020:

> 2 ISSUES- THE DISTANCE TO EMPTY ONLY READS 425 MILES. WITH A FULL 17 GALLON TAKE IT SHOULD BE AROUND 600. WHEN YOU FILL IT, IT CLICKS OFF 3-4 GALLONS SHORT OF FULL, ONLY HOLDING ABOUT 14 GALLONS. THE FUEL GAUGE SHOWS FULL. I THEN HAD TO TRICKLE IN THE REMAINING 3.5 GALLONS. HOW COULD IT SHOW FULL WITH 3.5 MORE GALLONS GOING IN? WHY IS THE TANK NOT ABLE TO TAKE THE FULL AMMOUNT OF FUEL?

17.     Indeed, Toyota first began receiving complaints from consumers within just a few months of the 2020 Highlander Hybrid going on sale.  As demonstrated by one consumer in this May 5, 2020 video, his 2020 Highlander Hybrid only took 13.13 gallons of gas before the automatic gas pump shut-off engaged, despite his driving the vehicle until the dashboard displayed only 5 miles to empty.[9]  Worse, after he slowly filled the tank until 14.5 gallons, gas began to splash out.  After coaxing a full 15 gallons into the tank, his vehicle read that it had a full tank and the DTE was 462.[10]

---

[9] *See* https://www.youtube.com/watch?v=HuU649ZRl-g.
[10] *Id.*

CLASS ACTION COMPLAINT

18.     When some customers call or email Toyota Customer Care to complain, Toyota initially obfuscates the issue by referring to variables that can influence fuel efficiency and DTE. When pressed, however, Toyota eventually acknowledges the issue to consumers, admitting that although the Class Vehicles have "a fuel tank with a 17.1 gallon capacity," only "approximately 14.2 gallons of a it [*sic*] useable." Yet Toyota has refused to date to provide any notice to consumers, owners and lessees—including Class Members—about the Defect or when they can expect a repair for the defect.  In fact, Toyota continues to advertise the fourth generation Highlander Hybrids as having a 17.1 gallon capacity fuel tank despite knowing that consumers are unable to actually achieve that capacity.

19.     Despite acknowledging the Defect internally and to authorized dealers, Toyota continues to market and sell the Class Vehicles, promising 36 miles per gallon ("MPG") for city driving, 35MPG for highway driving, and a combined 36 MPG.[11]  The combined mileage range is 616 miles, as noted by the U.S. Department of Energy in Figure 2.[12]

---

[11] *See* https://www.toyota.com/highlanderhybrid/ (last visited June 8, 2021).

[12] *See* hhttps://www.fueleconomy.gov/feg/Find.do?action=sbs&id=42477&id=43130 (last visited May 25, 2021).



**FIGURE 2**

20.     Based on pre-production testing and design failure mode analysis, early complaints to dealers and warranty claims, replacement part orders, and complaints made by consumers to Defendant TMS and NHTSA, Defendants were aware of the Fuel Tank Defect in Class Vehicles, but continued to misrepresent the fuel capacity of the Class Vehicles and their effective range on a single tank of gas, and further concealed the Defect and its effects from Plaintiffs and members of the Classes.

21.     Knowledge and information regarding the Fuel Tank Defect and the associated safety risk of increased emissions, damage to the fuel system components, and fuel spillage while re-fueling was in the exclusive and superior possession of Defendants and their authorized dealers and was not provided to Plaintiffs and members of the Classes, who could not reasonably discover the defect through due diligence.  Further, Toyota has experience with a similar defect resulting from the shape of the gas tank from its pre-production testing and post-production receipt of complaints about the 2019 Toyota RAV4 Hybrid,

whose 14.5 gallon tank also could not be filled to capacity.  Indeed, the RAV4 fuel tank defect is the subject of several class action lawsuits consolidated and currently pending in this district, *In Re Toyota RAV4 Hybrid Fuel Tank Litigation*, No. 3:20-cv-00337, which further put Toyota on notice of the defective nature of the fuel tanks in its hybrid sport utility vehicles. In mid-2020, Toyota released a repair for the 2019 and 2020 Toyota RAV4 Hybrids – a replacement fuel tank – which it had been working on for over a year.  Despite Defendants' knowledge that such a Fuel Tank Defect requires a replacement fuel tank, and their knowledge that the Fuel Tank Defect exists in the fifth generation Toyota Highlander Hybrid, Toyota continues to sell these defective vehicles, has failed to disclose the existence of the Fuel Tank Defect to directly to consumers, Plaintiffs and members of the Classes, has not issued a recall and has not remedied the Defect and/or compensated Class Vehicle purchasers, owners, or lessees for this material defect.  Discovery will show that that Toyota has not made any disclosure of the Fuel Tank Defect in order to not delay the release and sales of the fifth generation Toyota Highlander Hybrid because of the expense and time it would take to fix the Defect in all of the Class Vehicles.

22.     No reasonable consumer expects to purchase or lease a vehicle that contains a concealed Fuel Tank Defect which creates a safety hazard and effectively limits the fuel capacity and range of the vehicle.  The Fuel Tank Defect is material to Plaintiffs and members of the Classes because when they purchased or leased their Class Vehicles, they reasonably expected that they would be able to fill their fuel tanks to the advertised capacity, especially given that Toyota has not warned that the full capacity of the fuel tank may not be available and the full range of the Class Vehicles would not be available.  Had Defendants disclosed the Fuel Tank Defect, Plaintiffs and members of the Classes would not have purchased or leased their Class Vehicles, or would have

1   paid less for their Class Vehicles.

2                                **THE PARTIES**

3   **Plaintiffs Cheryl and Paulo Tavares**

4           23.     Plaintiffs Cheryl and Paulo Tavares are California citizens who

5   reside in Manteca, California.

6           24.     In or around June 2020, Plaintiffs Cheryl and Paulo Tavares

7   purchased a new 2020 Toyota Highlander Hybrid from Dublin Toyota, an

8   authorized Toyota dealer in Dublin, California.

9           25.     The Tavareses' traded in their 2019 Toyota RAV4 Hybrid because

10  the gas tank in the RAV4 would not fill to capacity.

11          26.     Plaintiffs Cheryl and Paulo Tavares purchased their Toyota

12  Highlander Hybrid vehicle primarily for personal, family, or household use.

13          27.     Passenger safety and reliability were important factors in their

14  decision to purchase their vehicle. Before purchasing their 2020 Toyota

15  Highlander Hybrid, Plaintiffs Cheryl and Paulo Tavares reviewed the Toyota

16  brochure for the Highlander as well as videos produced by TMS regarding the

17  capabilities of the vehicle.  Plaintiffs Cheryl and Paulo Tavares ordered their

18  vehicle and reviewed the specification sheet carefully before the dealership

19  transmitted the order to TMS. Plaintiffs Cheryl and Paulo Tavares believed that

20  the Toyota Highlander Hybrid would be a safe and reliable vehicle and would

21  have a gas tank which could be filled to capacity, unlike their 2019 Toyota

22  RAV4 Hybrid.

23          28.     The MPGs and the vehicle's range based on stated fuel capacity

24  were primary factors in the Tavareses' decision to purchase their vehicle. The

25  Tavareses believed that the 2019 Toyota Highlander Hybrid would provide both

26  the promised fuel economy as well as the capacity to hold 17.1 gallons of gas to

27  deliver a range of at least 615 DTE per tank of gas.

28

29.     Toyota's misstatements and omissions were material to Plaintiffs Cheryl and Paulo Tavares. Had Toyota disclosed its knowledge of the Fuel Tank Defect before Plaintiffs Cheryl and Paulo Tavares purchased their Highlander Hybrid, they would have seen and been aware of the disclosures. Furthermore, had they known of the Fuel Tank Defect, Plaintiffs Cheryl and Paulo Tavares would not have purchased their vehicle or would have paid less for it.

30.     Since the first time they had to fill up the car with gasoline, Plaintiffs Cheryl and Paulo Tavares noticed that the automatic shut-off clicks after only 13.5 gallons have poured into the tank.  Having familiarity with this issue from their previous vehicle, Plaintiffs Cheryl and Paulo Tavares complained to Dublin Toyota during their 5,000 mile vehicle servicing on September 24, 2020.  The technician at Dublin Toyota told Cheryl Tavares that they had received complaints about the issue, but since it was the same problem as the RAV4, they would not need to run a diagnostic.

31.     After months of waiting for a repair, Cheryl Tavares called Toyota Customer Care on April 12, 2021, and had a case opened about the failure of the fuel tank in her vehicle to be able to be filled to the advertised capacity.   On May 17, 2021, when she called Toyota Customer Care to complain about an unrelated issue with the vehicle, she asked for an update on the fuel tank issue. The Toyota representative told her there was no fix for her vehicle and recommended she keep calling back every few months to check if one would be released.

32.     Following the dealership visit and her calls to Toyota Customer Care, Plaintiffs Cheryl and Paulo Tavares have continued to experience the Fuel Tank Defect, leading to refill their vehicle more often than contemplated while purchasing a hybrid vehicle with a 17.1 gallon tank and a stated range of over 600 miles on a single tank.

33.     The Tavareses will be unable to rely on the Class Vehicles'
advertising and labeling of its fuel tank capacity and DTE in the future, and so
will not purchase or lease a Class Vehicle in the future although they would like
to.

34.     At all times, Plaintiffs Cheryl and Paulo Tavares, like all Class
Members, have attempted to drive their Toyota Highlander Hybrid in a manner
that is and was both foreseeable, and in which it was intended to be used.

**Plaintiff Charles Deffendall**

35.     Plaintiff Charles Deffendall is a Texas citizen residing in El Paso,
Texas.

36.     In or around May 2020, he purchased a new 2020 Highlander
Hybrid Limited from Universal Toyota, an authorized Toyota dealership in San
Antonio, Texas.

37.     Plaintiff Deffendall purchased his Toyota Highlander Hybrid
vehicle primarily for personal, family, or household use.

38.     Passenger safety and reliability were important factors in Plaintiff
Deffendall's decision to purchase his vehicle. Before purchasing his Toyota
Highlander Hybrid, Plaintiff Deffendall performed online research, including on
Edmunds.com and reviewed the Toyota website and several dealership websites
for the Highlander Hybrid. Plaintiff Deffendall test drove and reviewed the
Monroney window sticker and sales contract for his vehicle before purchase.
Plaintiff Deffendall believed that the Toyota Highlander Hybrid would be a safe
and reliable vehicle and would have a gas tank which could be filled to capacity.

39.     The MPGs and the vehicle's range based on stated fuel capacity
were primary factors in Plaintiff Deffendall's decision to purchase his vehicle.
Plaintiff Deffendall believed that the Toyota Highlander Hybrid would provide
both the promised fuel economy as well as the capacity to hold 17.1 gallons of

1  gas to deliver a range of at least 615 DTE per tank of gas.

2      40.    Toyota's misstatements and omissions were material to Plaintiff

3  Deffendall. Had Toyota disclosed its knowledge of the Fuel Tank Defect before

4  Plaintiff Deffendall purchased his Highlander Hybrid, Plaintiff would have seen

5  and been aware of the disclosures. Furthermore, had he known of the Fuel Tank

6  Defect, Plaintiff Deffendall would not have purchased his vehicle or would have

7  paid less for it.

8      41.    Shortly after purchasing his vehicle, Plaintiff Deffendall noticed that

9  he was unable to fill up his gas tank to capacity.  Over time, the capacity of his

10  fuel tank has decreased – where he was originally able to go between 480 and

11  500 miles on a tank, he is only able to go approximately 430 miles on a tank.  At

12  no time has he been able to go over 600 miles on a tank, as promised by Toyota.

13  On May 28, 2021, Mr. Deffendall complained to Fox Toyota, an authorized

14  Toyota dealership in El Paso, Texas, about the limited range of his vehicle and

15  the problem with his fuel tank.  The dealership promised to look over the

16  vehicle, but when he picked up the vehicle, he was told that there was nothing

17  wrong with his car.

18      42.    Plaintiff Deffendall has continued to experience the Fuel Tank

19  Defect, leading to refill his vehicle more often than contemplated while

20  purchasing a hybrid vehicle with a 17.1 gallon tank and a stated range of over

21  600 miles on a single tank.

22      43.    Plaintiff Deffendall will be unable to rely on the Class Vehicles'

23  advertising and labeling of its fuel tank capacity and DTE in the future, and so

24  will not purchase or lease a Class Vehicle in the future although he would like to.

25      44.    At all times, Plaintiff Deffendall, like all Class Members, have

26  attempted to drive his Toyota Highlander Hybrid in a manner that is and was

27  both foreseeable, and in which it was intended to be used.

28

**Defendants**

45.     Defendant Toyota Motor Sales, U.S.A., Inc.("TMS"), is a corporation organized and in existence under the laws of the State of California and registered to do business in the State of California. TMS is headquartered at 6565 Headquarters Dr, Plano, TX 75024. TMS markets motor vehicles, parts, and other products for sale in California, in the United States, and throughout the world. TMS is the warrantor and distributor of Class Vehicles in California and throughout the United States.  Discovery will show that TMS maintains the North American Parts Center in Ontario, California, which is responsible for shipping "goods to over 16 distribution centers across the US," and maintains the Los Angeles Parts Distribution Center in Torrance, California, which "provide[s] daily service to over 240 Toyota and Lexus Dealers across California and the western U.S."[13]

46.     In order to sell vehicles to the general public, TMS enters into agreements with dealerships who are then authorized to sell Toyota-branded vehicles to consumers such as Plaintiffs.  In return for the exclusive right to sell new Toyota vehicles in a geographic area, authorized dealerships are also permitted to service and repair these vehicles under the warranties TMS provides directly to consumers.  These contracts give TMS a significant amount of control over the actions of the dealerships, including sale and marketing of vehicles and parts for those vehicles.  All service and repairs at an authorized dealership are also completed according to TMS's explicit instructions, issued through service manuals, technical service bulletins ("TSBs"), and other documents, that were created with input from TMNA.  Per the agreements between TMS and the authorized dealers, consumers such as Plaintiffs can receive services under TMS's issued warranties at dealer locations that are convenient to them. TMS

[13] https://www.toyota.com/usa/operations/map.html#!/USCA (last visited Jan. 30, 2020)

has a nationwide dealership network and operates offices and facilities throughout the United States.

47.     Defendant Toyota Motor North America, Inc. ("TMNA"), is a corporation organized and in existence under the laws of the State of California and registered to do business in the State of California. TMNA is headquartered at 6565 Headquarters Dr, Plano, TX 75024. According to Toyota's official website, TMNA "brings together Toyota's marketing, sales, engineering and manufacturing arms in North America on one shared, state-of-the-art campus."[14]

48.     TMNA also maintains offices in Torrance.  Additionally, TMNA's research and development offices are located in Gardena, California, where they are "engaged in engineering design, vehicle evaluation, powertrain development & calibration, regulatory affairs, and alternative powertrain research for Toyota and Lexus vehicles manufactured or sold in North America."[15]  The Gardena offices are also known as "Toyota Technical Center."  ("TTC").

49.     TMS and TMNA also develop and disseminate the owners' manuals, warranty booklets, maintenance schedules, advertising such as vehicle brochures, and other promotional materials relating to the Class Vehicles through the dealership network.  TMS is also responsible for the production and content of the information on the Monroney Stickers.

50.     Founded in 1937 and headquartered in Toyota City, Japan, Defendant Toyota Motor Corporation ("TMC") is a corporation organized under the laws of Japan. TMC manufacturers and distributes automobiles, as well as parts for Toyota branded vehicles, and is the parent company of both TMS and TMNA.  Discovery will show that TMC is responsible for the design of the Class

---

[14] https://www.toyota.com/usa/operations/map.html#!/tcal (last visited Jan. 30, 2020)

[15] https://www.toyota.com/usa/operations/map.html#!/ttc_gardena (last visited Jan. 30, 2020)

Vehicles, and also manufactures the Class Vehicles, their fuel systems, and the fuel system's components, in Japan and in the United States through TMNA.

51.    Defendants, through their various entities, design, manufacture, market, distribute, service, repair, sell, and lease passenger vehicles, including the Class Vehicles, nationwide and in California.

52.    At all relevant times, Defendants were and are engaged in the business of designing, manufacturing, constructing, assembling, marketing, distributing, and selling automobiles and motor vehicle components in Riverside County and throughout the United States of America.

## JURISDICTION

53.    This is a class action.

54.    Members of the proposed Class, which includes citizens of all 50 states, or in the alternative, California, are citizens of states other than Texas, where TMS and TMNA are headquartered, and California, where TMS and TMNA are incorporated.

55.    .  Discovery will show that aggregate claims of individual Class Members exceed $5,000,000.00 in value, exclusive of interest and costs.

56.    Accordingly, jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d).

## VENUE

57.    Defendants, through their businesses of marketing, distributing, selling, and leasing the Class Vehicles, has established sufficient contacts in this district such that personal jurisdiction is appropriate. Toyota is deemed to reside in this district pursuant to 28 U.S.C. § 1391(a).

58.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Plaintiffs reside in the County of San Joaquin, California. In addition, Plaintiffs  Declaration, as required under California Civil Code section 1780(d)

but not pursuant to *Erie* and federal procedural rules, reflects that a substantial part of the events or omissions giving rise to the claims alleged herein occurred, or a substantial part of property that is the subject of this action, is situated in Riverside County, California. It is attached as Exhibit 1.

## FACTUAL ALLEGATIONS

59.    Toyota has thousands of authorized dealerships across the United States and controls the distribution of automobiles, parts, services, and warranty repairs throughout the United States, all of which are under Toyota's control. Toyota authorizes these distributors and dealerships to sell Toyota vehicles, parts, and accessories and to service and repair Toyota vehicles using Toyota parts.  Toyota sells its vehicles to its authorized distributors and dealerships, which in turn sell those vehicles to consumers.  After these dealerships sells cars to consumers, including the Plaintiffs and Class members, they purchase additional inventory from Toyota to replace the vehicles sold, increasing Toyota's revenues.  Thus, Plaintiffs' and Class Members' purchase of Class Vehicles accrues to the benefit of Toyota by increasing its revenues.

60.    Since approximately 2015, Toyota has been developing the fourth generation Highlander and Highlander hybrid. Toyota designed, manufactured, distributed, sold, and leased the Class Vehicles. Toyota has sold, directly or indirectly, through dealers and other retail outlets, thousands of Class Vehicles in California, and nationwide. Toyota warrants and services the Class Vehicles through its nationwide network of authorized dealers and service providers.

61.    While the Class Vehicles are hybrids, they also have an internal combustion engine fueled by gasoline.  A functional fuel system requires proper venting, both to allow the accumulating gas vapors in the fuel tank to release safely and to allow air to escape so that fuel can take it place when being filled at a gas station.

62.    When a fuel system cannot properly vent air and gas vapors during the refueling process, the air the system should expel from the tank instead goes up the filler neck.  This activates the mechanical pressure switch on the fuel pump, which informs the pump that the car is full and shuts off the flow of fuel. If the fuel tank cannot properly vent, the fuel efficiency of the vehicle can also suffer, emissions from the vehicle can increase, and the system itself can sustain damage.

63.    Discovery will show that the Class Vehicles are equipped with fuel systems which do not properly vent the air and gas vapors from the fuel tanks, increasing emissions, reducing efficiency, and making it impossible to use the full capacity of fuel tank.  This is in contrast to the 2020 and 2021 Toyota Highlander non-hybrid models, and even the third generation Toyota Highlander Hybrids, both of which use a differently configured fuel system and different component parts.

64.    The Class Vehicles are equipped with a 17.1 gallon, latitudinal fuel tank whose Toyota part number is 77001-0E160 which is labeled "1"  Figure 3. In contrast, the gasoline-only fourth generation Toyota Highlanders use a 17.9



1   gallon tank, Toyota part number 77001-0E160, which is positioned

2   longitudinally in the vehicle.

3

4   **FIGURE 3**

5       65.    This setup differs also significantly from the set-up of the previous

6   generation Toyota Highlander Hybrid, as shown in Figure 4, whose 17.2 gallon

7   tank has a different shape than the one in Class Vehicles.



**FIGURE 4**

26      66.    Additionally, the fuel pick-up line, which draws fuel from the fuel

27   tank, is designed so that the intake is not at the bottom of the fuel tank. The

positioning is intentional, so that residual fuel does not get into the engine as residual fuel can possibly be contaminated with debris, water, or other materials. This design decision, which was made before the first sale of the Class Vehicle, renders a percentage of fuel in the tank inaccessible and not useable.

67.    Due to the Fuel Tank Defect and the insufficient venting of air and gas vapors, combined with the positioning of the fuel pick-up line, the Class Vehicles' fuel tanks are unable to be filled to their full capacity.  .  Discovery will show that the lack of proper venting causes unsafe emissions from Class Vehicles, damages the components of the fuel system such that they will have to be replaced sooner than anticipated, and creates a dangerous risk of overflow when consumers are filling their vehicles at gas stations.

68.    Class Member complaints to NHTSA, cited *infra*, as well as the hundreds of complaints Toyota has received directly from consumers, and the complaints Toyota has received via its authorized dealerships, demonstrate the unsafe and widespread nature of the Fuel Tank Defect and Defendants' awareness that the Defect existed before selling the Class Vehicles to Plaintiffs.

**Toyota Had Superior and Exclusive Knowledge of the Fuel Tank Defect**

69.    Toyota had superior and exclusive knowledge of the Fuel Tank Defect and knew or should have known that the defect was not known or reasonably discoverable by Plaintiffs and Class Members before they purchased or leased the Class Vehicles.

70.    Plaintiffs are informed and believe and based thereon allege that before Plaintiffs purchased or leased their respective Class Vehicles, and since pre-production road testing of the 2020 Toyota Highlander beginning in late 2018, if not earlier, Toyota knew about the Fuel Tank Defect through sources not available to consumers, including pre-release testing data, such as design mode failure analysis, early consumer complaints to Toyota and its dealers, testing

conducted in response to those complaints, high failure rates and replacement part sales data, and other aggregate data from Toyota dealers about the problem. Publicly available facts set forth *infra* further confirm Toyota's knowledge.

71.     Toyota is experienced in the design and manufacture of consumer vehicles. As an experienced manufacturer, Toyota conducts tests, including pre-sale durability testing, on vehicle components such as the fuels systems in Class Vehicles, to verify the parts are free from defect and align with Toyota's specifications.  Further, pre-production testing on vehicles and their components is designed to be harsher than expected "real-world" driving experience of consumers.  Such testing necessarily includes the filling and refilling of the vehicles' fuel tanks. Thus, Toyota knew or should have known that the fuel systems in Class Vehicles were defective and led to the inability of the fuel tank to be filled to capacity.

72.     Additionally, Toyota should have learned and did learn of this widespread Defect from the sheer number of reports received from dealerships and from customer complaints directly to Toyota. Toyota's customer relations department collects and analyzes field data including, but not limited to, repair requests made at dealerships, technical reports prepared by engineers who have reviewed vehicles for which warranty coverage is being requested, parts sales reports, and warranty claims data.

73.     Indeed, as of May 2020, many Class Members had already reported the Fuel Tank Defect directly to Toyota at via Toyota's Customer Care line, Toyota's owners' forum at www.toyota.com, and to various Toyota authorized dealerships.

74.     Moreover, Toyota is experienced in the design and manufacture of consumer vehicles. As an experienced manufacturer, Toyota conducts tests, including pre-sale durability, reliability, and safety testing, to verify the Class

Vehicles and their components are free from defects and align with Toyota's specifications.  Toyota also uses pre-production testing to evaluate assembly methods and manufacturing workflows, in addition to evaluating the final product – the car.  Thus, Toyota knew or should have known of the Fuel Tank Defect and its inherent risk to the vehicle's safety.

75.     Toyota's pre-production vehicle testing is particularly robust, as demonstrated by a timeline of vehicle testing and evaluation published on TMC's website, www.toyota-global.com, attached as Exhibit A, which discovery will show is conducted in concert with TNMA.  Testing includes test driving the vehicle on the four test tracks at the Tahara Plant, TMC's main manufacturing facility in Japan, at the Shibetsu Proving Ground in Hokkaido, Japan, or at the Toyota Arizona Proving Ground in Wittman, Arizona.  The Proving Ground facilities enable Toyota to conduct continuous driving tests at 250 kilometer/hour in both extreme temperatures.  Testing at these facilities obviously necessitates filling the gas tank of the test vehicle with gasoline multiple times, and as such, Toyota would have become aware of the Fuel Tank Defect.

76.     Toyota has previously seen a similar Fuel Tank Defect in fifth generation Toyota RAV4 Hybrids, in which the shape of the fuel tank sub-assembly made it impossible for consumers to use the full capacity of the 14.5 gallon tank.  But where Toyota rolled out a replacement fuel tank for the 2019 or later Toyota RAV4 Hybrids in 2020, it has failed to provide a repair for the similar defect in the Class Vehicles.

77.     Toyota's warranty department analyzes and collects data submitted by its dealerships in order to identify trends in its vehicles. It is Toyota's policy that when a repair is made under warranty, the dealership must provide Toyota with detailed documentation of the problem and the repair employed to correct it in order to be reimbursed. Dealerships have an incentive to provide detailed

1   information to Toyota, because they will not be reimbursed for any repairs unless

2   the justification is sufficiently detailed.  As such, any dealer investigation of a

3   consumer's complaint that they could not fill up the tank complete would sent to

4   TMS, as the dealer seeks reimbursement under the bumper-to-bumper warranty

5   for any time its technician would have spent trying to identify a problem.

6       78.    However, as demonstrated by the experience of Plaintiffs, by

7   September 2020, Toyota had directed its dealerships that they not perform

8   diagnostic testing of the Class Vehicles in response to fuel tank capacity

9   complaints because it was well-aware of the problem and would not compensate

10  dealerships for any time taken to inspect the vehicle in relation to this problem.

11  Discovery will show that instead of issuing a TSB, because no fix was available,

12  TMS and TMNA issued a directive to the dealerships via its email or newsletter

13  system, neither of which it is required to file with NHTSA and thus remains

14  hidden from consumers.

15      79.    Discovery will show that no Class Member has received a repair

16  from Toyota or any Toyota authorized dealer which resolves the Fuel Tank

17  Defect. Instead, Toyota and its authorized dealers have informed customers that

18  no repair exists or that their vehicle is operating as designed.

19      80.    In addition, Toyota monitors customers' complaints made to

20  NHTSA. Federal law requires automakers like Toyota to be in close contact with

21  NHTSA regarding potential automobile defects, including imposing a legal

22  requirement (backed by criminal penalties) compelling the confidential

23  disclosure of defects and related data by automakers to NHTSA, including field

24  reports, customer complaints, and warranty data. *See TREAD Act,* Pub. L. No.

25  106-414, 114 Stat.1800 (2000).

26      81.    Automakers have a legal obligation to identify and report emerging

27  safety-related defects to NHTSA under the Early Warning Report requirements.

28

*Id.* Similarly, automakers monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, including safety-related defects. *Id.* Thus, Toyota knew or should have known of the many complaints about the Fuel Tank Defect logged by the NHTSA Office of Defect Investigation (ODI), and the content, consistency, and large number of those complaints alerted, or should have alerted, Toyota to the Fuel Tank Defect.

82.     Complaints filed by consumers with the NHTSA and other websites, which Toyota actively monitored during the relevant period, continue to accrue and demonstrate that the Fuel Tank Defect is a widespread, dangerous, and unresolved problem. The following are examples of many complaints from owners and lessees of the Class Vehicles concerning the Fuel Tank Defect available through NHTSA's website, www.safercar.gov. Spelling and grammar mistakes appear as in original.

83.     For example, complaints to NHTSA involving the 2020 Highlander Hybrid include:

a.  **DATE COMPLAINT FILED:**    April 24, 2020
    **NHTSA/ODI ID:**    11394879
    **DATE OF INCIDENT:**    February 5, 2021
    **VIN:**    5TDEBRCH3LS****
    **SUMMARY:** 2020 TOYOTA HIGHLANDER HYBRID AWD. WHEN FILLING FROM ALMOST EMPTY (PER LOW FUEL WARNING LIGHT AND DISTANCE TO EMPTY READING ALMOST 0), TANK ONLY ACCEPTS ~12.5 GALLONS BEFORE GAS STATION FUEL NOZZLE AUTO CLICKS OFF. THE FUEL GAGE AT THIS POINT INDICATES THAT THE VEHICLE IS ~7/8 FILLED. THE OWNERS MANUAL WARNS ABOUT NOT ATTEMPTING TO FILL AFTER THE FUEL NOZZLE AUTOMATICALLY CLICKS OFF. BEING UNABLE TO FILL TANK MAY LEAD TO OWNERS ATTEMPTING TO OVERFILL TANKS AND COULD RESULT IN INADVERTENTLY SPILLING FUEL WHICH POSES A SAFETY RISK AND AN

ENVIRONMENTAL DAMAGE RISK. IT CAN ALSO LEAD TO MORE EMISSIONS. A SIMILAR PROBLEM EXISTS WITH 2019/2020 TOYOTA RAV4 PER NHTSA RECORDS, TOYOTA HAS PROPOSED A FIX FOR THIS VEHICLE BUT HAS STATED THAT NO OTHER MODELS ARE AFFECTED BY THIS ISSUE. THE PROBLEM DESCRIBED ABOVE IS ALMOST IDENTICAL WITH THE EXCEPTION THAT THE VEHICLES HAVE DIFFERENT FUEL TANK CAPACITIES. TOYOTA HAS INDICATED THAT THIS IS "NORMAL".

b.  **DATE OF INCIDENT:**     March 3, 2021
    **DATE COMPLAINT FILED:**    March 7, 2021
    **NHTSA/ODI ID:**     11399660
    **VIN:**    5TDGBRCH7LS****
    **SUMMARY:** THE VEHICLE IS SOLD AS HAVING A 17 GALLON FUEL TANK. I'VE DRIVEN THE VEHICLE FOR 5000 PLUS MILES NOW. I HAVE NEVER BEEN ABLE TO GET MORE THAN 13 GALLONS OF FUEL INTO THE TANK. I HAVE WAITED UNTIL THE GAGE SAID THERE WAS ONLY 12 MILE UNTIL EMPTY. STILL COULD ONLY FILL UP WITH ON 13 GALLONS OF FUEL. THE GAGE SAY'S IT'S FULL. I HAVE MADE THE TOYOTA DEALERSHIP AWARE OF THE ISSUE. BUT THEY SAID THERE WAS NOTHING ON THEIR SYSTEM ABOUT A RECALL OR NEEDED REPAIR. IF THE VEHICLE IS ADVERTISED AS HAVING A 17 GALLON TANK I SHOULD BE ABLE TO USE THAT WHALE 17 GALLONS OF FUEL. INSTEAD I CAN ONLY FILL UP TO 13 GALLONS.

c.  **DATE OF INCIDENT:**     February 28, 2021
    **DATE COMPLAINT FILED:**    March 31, 2021
    **NHTSA/ODI ID:**     11405736
    **VIN:**    5TDHBRCH6LS****
    **SUMMARY:** EACH TIME I FILL UP THE CAR WITH GAS I AM UNABLE TO FILL THE TANK TO ITS LISTED CAPACITY. THE VEHICLE HAS A 17 GALLON TANK, BUT WHEN THE VEHICLE IS NEAR EMPTY (1-2 GALLONS REMAINING) I CAN PUMP IN ONLY 12-13 GALLONS OF GAS. THIS GREATLY IMPACTS THE RANGE OF THE VEHICLE. THE DATE SHOWN BELOW IS MOST RECENT FILL-UP, IT HAS HAPPENED EACH TIME I FILL UP. I HAVE REPORTED THIS TO MY TOYOTA DEALER.

d. **DATE COMPLAINT FILED:**   January 21, 2021
   **NHTSA/ODI ID:**   11389244
   **DATE OF INCIDENT:**   March 28, 2020
   **VIN:**   5TDXBRCH9LS\*\*\*\*
   **SUMMARY:** FUEL GAUGE DOES NOT PROPERLY REGISTER
   FULL HYBRID FUEL TANK (DESIGN) AND/OR DEFECTIVE
   FUEL LEVEL SENDING UNIT. TOYOTA SERVICE REPORT
   (6032680/1- 25 SEP 2020); TOYOTA SERVICE REPORT
   (6046594/1- 21 JAN 2021).

e. **DATE COMPLAINT FILED:**   January 19, 2021
   **NHTSA/ODI ID:**   11388861
   **DATE OF INCIDENT:**   August 1, 2020
   **VIN:**   5TDEBRCH6LS\*\*\*\*
   **SUMMARY:**   2020   TOYOTA   HIGHLANDER   HYBRID
   PLATINUM AWD CANNOT FILL UP FUEL TANK ALL THE
   WAY. MAX CAN FILL IT UP WHEN IT SHOWS 0 MILES LEFT
   OF FUEL IS LESS THAN 13 GALLON AND CAR HAS OVER 17
   GALLONS. TOYOTA IS SAYING THEY DON'T KNOW WHAT
   THE ISSUE IS. NO SOLUTION AT THIS TIME FOR A $50K CAR

f. **DATE COMPLAINT FILED:**   December 7, 2020
   **NHTSA/ODI ID:**   11378393
   **DATE OF INCIDENT:** August 3, 2020
   **VIN:**   5TDHBRCH7LS\*\*\*\*
   **SUMMARY:** THE GAS TANKS HOLDS 17 GALLONS OR ~570
   MILES TO EMPTY. THE MOST I CAN FILL IT IS ~14 GALLONS
   OR ~470 MILES TO EMPTY. IT ALWAYS CLICKS OFF LIKE IT'S
   FULL. I'VE TRIED GENTLY TOPPING OFF, SLIGHTLY
   PULLING OUT FUEL MODEL ETC. NOTHING HAS WORKED.
   THIS HAS HAPPENED SINCE THE VEHICLE WAS NEW AND
   DRIVEN OFF THE LOT. THIS IS ALL WHILE THE VEHICLE IS
   PARKED AT A GAS PUMP.

g. **DATE COMPLAINT FILED:**   October 15, 2020
   **NHTSA/ODI ID:**   11364594
   **DATE OF INCIDENT:**   October 15, 2020
   **VIN:**   5TDBBRCH3LS\*\*\*\*
   **SUMMARY:** I PURCHASED A 2020 TOYOTA HIGHLANDER
   HYBRID AWD IN MAY 2020. IN JUNE 2020, I NOTICED A

DISCREPANCY BETWEEN THE GAS GAUGE ABS THE DISTANCE TO EMPTY INDICATOR. THE GAS GAUGE SAID THERE WAS 3/4 OF A TANK LEFT BUT THE DTE SAID I HAD ONLY 43 MILES. I WENT TO THE GAS STATION TODAY (OCTOBER 2020) TO FILL UP MY VEHICLE AND FILLED IT UNTIL THE GAS SHUT-OFF TRIPPED. I TURNED ON MY CAR AND NOTICED THAT MY GAS GAUGE SAID IT WAS ONLY 7/8TH FULL. THINKING IT TRIPPED TOO SOON I REFILLED IT AGAIN BUT ONLY 0.5 GALLONS WENT INTO TANK BEFORE THE SHUT-OFF TRIPPED AGAIN. WHEN I TURNED ON THE CAR THIS TIME THE GAS GAUGE INDICATED IT WAS FULL. I DOUBT THE GAS GAUGE IS FUNCTIONING PROPERLY.

h. **DATE COMPLAINT FILED:**   May 6, 2020
   **NHTSA/ODI ID:**   11323593
   **DATE OF INCIDENT:**   May 3, 2020
   **VIN:**   5TDGBRCH6LS****
   **SUMMARY:** MY NEW 2020 HIGHLANDER HYBRID HAS A BIG ISSUE WITH THE GAS TANK. I GET ONLY 460 MILES, EVEN IF I TOP IT OFF WITH THE GAS SPEWING OUT. TOYOTA ADVERTISED A 600 MILE RANGE TO THE HIGHLANDER HYBRID. THE 600 MILE FUEL RANGE SEEMS VERY OFF WITH THE 2020 HIGHLANDER HYBRID. I HAVE THE XLE AND ALWAYS HAVE KEPT IT IN ECO MODE. I'VE DRIVEN OVER A THOUSAND MILES ON THE CAR, BUT THE MILE RANGE ESTIMATE ON THE CAR IS INACCURATE AND SEEMS TO BE OFF A LOT IF IT'S SUPPOSED TO GET 600 MILES TO A TANK. MORE IMPORTANTLY, WHEN THE TANK IS EMPTY (THE DASH SAYS I HAD 5 MILES LEFT TO EMPTY), THE GAS TANK ONLY HOLDS AROUND 13 GALLONS EVEN THOUGH THE FUEL TANK CAPACITY IS SUPPOSEDLY 17.1 GALLONS. THOSE 4 GALLONS MAKE FOR 140 MILES LESS DISTANCE ON A TANK. IF I WAIT AND KEEP ON FORCING THE GAS IN SLOWLY, I CAN GET 15 GALLONS BUT I DON'T LIKE THE IDEA OF HAVING TO KEEP ON PUSHING THE GAS NOZZLE UNTIL THE GAS SPEWS OUT OF THE TANK JUST TO GET 15 GALLONS IN. I KNOW TOYOTA HAS BEEN HAVING GAS TANK ISSUES IN OTHER MODELS RECENTLY. ONE OF THE MAIN REASONS I BOUGHT THE CAR WAS FOR THE FUEL TANK CAPACITY AND RANGE. A VIDEO EXPLANATION OF THE PROBLEM IS BELOW:

HTTPS://WWW.YOUTUBE.COM/WATCH?V=HUU649ZRL-
G&T=245S. *TR

i.  **DATE COMPLAINT FILED:**   April 24, 2020
    **NHTSA/ODI ID:**   11322170
    **DATE OF INCIDENT:**   April 22, 2020
    **VIN:**   5TDHBRCH8LS****
    **SUMMARY:** TOYOTA ADVERTISES AND REPRESENTS THAT
    THE HIGHLANDER HYBRID'S FUEL TANK CAPACITY IS 17.1
    GALLONS, AND BASED ON ITS 35 MPG RATING, THE RANGE
    SHOULD BE ABOUT 600 MILES. HOWEVER, I AM NOT ABLE
    TO FILL THE TANK BY MORE THAN 12 GALLONS THUS
    REDUCING MY RANGE TO 420 MILES. I BELIEVE THERE IS A
    DEFECT IN THE NEWLY DESIGNED SADDLE TANK WHICH
    PROHIBITS THE TANK FROM BEING FILLED COMPLETELY
    THUS CHEATING ME OUT OF ABOUT 180 MILES OF DRIVING
    RANGE.

84.    For example, complaints to NHTSA involving the 2021 Highlander
Hybrid include:

a.  **DATE COMPLAINT FILED:**   April 28, 2021
    **NHTSA/ODI ID:**   11414311
    **DATE OF INCIDENT:**   April 21, 2021
    **VIN:**   5TDEVRCH5MS****
    **SUMMARY:** I REPORTED MY GAS TANK NOT FILLING PAST
    12.9 GALLONS OF GASOLINE ON NUMEROUS FILL UPS ON
    MY NEW 2021 HIGHLANDER HYBRID PLATINUM TO
    TOYOTA SERVICE DEPARTMENT. THE HIGHLANDER ON
    INVOICE SAYS IT'S A 17 GALLON TANK CAPACITY. TOYOTA
    SERVICE DEPART REFILLED MY EMPTY TANK TO12.6
    GALLONS VERIFYING MY COMPLAINT. THE SERVICE
    ADVISOR INFORMED ME THEY NOTIFIED TOYOTA AND
    TOYOTA RESPONDED IN SAYING THEY ARE AWARE OF THE
    ISSUE AND THERE'S NOTHING TODO. THE TOYOTA
    SERVICE ADVISOR INFORM ME UNTIL THERE IS ENOUGH
    COMPLAINTS THEN TOYOTA WOULD ISSUE A RECALL

b.  **DATE COMPLAINT FILED:** April 4, 2021
    **NHTSA/ODI ID:**   11406311

**DATE OF INCIDENT:**   March 16, 2021
**VIN:**   5TDDBRCH8MS****
**SUMMARY:** THIS IS NOT A SAFETY ISSUE PER SE BUT ONE OF FALSE ADVERTISING. TOYOTA ADVERTISES THE RANGE OF MY HYBRID HIGHLANDER AS 600 MILES ON 17.1 GAL TANK AT 35 MPG. I DO GET 35 MPG (WHICH IS QUITE COMMENDABLE FOR A VEHICLE THIS SIZE) BUT I CANNOT FILL THE FUEL TANK MORE THAN 12-13 GAL EVEN WHEN NEARLY BONE-DRY EMPTY. IN TURN I CANNOT DRIVE ANY FURTHER THAN 450 MILES WITHOUT FILLING UP. SOMETHING IS WRONG WITH EITHER THE DESIGN OF FUEL TANK SUCH THAT NOT ALL THE FUEL CAN BE ACCESSED OR THE DESIGN OF THE FUEL FILLER HOSE SUCH THAT ONE CANNOT FILL THE TANK COMPLETELY. ANOTHER OPTION IS PERHAPS THE FUEL TANK IS NOT TRULY 17.1 GALLONS AS DOCUMENTED. TOYOTA SHOULD NOT ADVERTISE A RANGE OF 600 MILES WHEN THIS IS NOT REALISTIC EVEN WHEN ACHIEVING 35 MPG.

c.   **DATE COMPLAINT FILED:**   March 31, 2021
    **NHTSA/ODI ID:**   11405764
    **DATE OF INCIDENT:** March 31, 2021
    **VIN:**   5TDEBRCH5MS****
    **SUMMARY:** THE 2021 HIGHLANDER HYBRID IS NOT TAKING MORE THAN 10-11GALLONS PER FILL UP AND THE DISTANCE TO EMPTY INDICATOR ONLY STATES APPROX. 420MILES NOT THE 590-615MILES BASED ON THE STATED 34/35 MPG PER TOYOTA ON THE HYBRID MODEL. WE HAVE FILLED THE VEHICLE SEVERAL TIMES AND AT MULTIPLE GAS STATIONS AND EACH TIME THE TANK WILL NOT

d.   **DATE COMPLAINT FILED:**   March 29, 2021
    **NHTSA/ODI ID:**   11405453
    **DATE OF INCIDENT:** March 29, 2021
    **VIN:**   5TDZARAHXMS****
    **SUMMARY:** THE 2021 TOYOTA HIGHLANDER HYBRID GAS TANK IS EXACTLY 17.1 US GALLONS IN SIZE BUT EVEN WHEN THE LOW FUEL INDICATOR LIGHT TURN ON AND THE THE FUEL GAUGE IS AT NEAR EMPTY IT WILL ONLY ACCEPT A MAXIMUM OF 12.9 TO 13.8 GALLONS. TOYOTA STATES THAT THE MAXIMUM RANGE ON A FULL TANK OF

THE VEHICLE IS 615 MILES BUT WHEN FULL THE MAX-RANGE ALWAYS FALLS BETWEEN 460 TO 490 MILES GIVEN MY MPG OF 34.5 TO 36.5. THERE IS AN ISSUES WITH THE FUELING SYSTEM THAT DOES NOT ALLOW THE VEHICLE TO BE PROPERLY FUELED OR THE SYSTEM IS DEFECTIVE. OTHER DRIVERS HAVE BEEN HAVING THE SAME ISSUES TRYING TO FILL THEIR GAS TANKS TO THE INDICATED AMOUNT AFTER THE FUEL INDICATOR COME ON AND HAVING LOW RAGE LEFT OF ABOUT 25 MILES. THIS IS AN ISSUES THAT HAPPENS AT VARIOUS GAS STATIONS SO THE ISSUE IS NOT THE PUMP BUT THE VEHICLE.

e. **DATE COMPLAINT FILED:**    January 25, 2021
   **NHTSA/ODI ID:**    11389811
   **DATE OF INCIDENT:**    January 25, 2021
   **VIN:**    5TDEBRCH7MS****
   **SUMMARY:** MY 2021 HIGHLANDER HYBRID PLATINUM IS EXPERIENCING A FUEL FILLING ISSUE. OVER THE FIRST 2,000 MILES, THE VEHICLE WILL NOT TAKE MORE THAN 13.5 GALLONS AT FILL UP ' NO TOPPING OFF. THE CAR HAS A 17.1 GALLON TANK. THE CAR HAS GONE AS LOW AS 2 MILES TO EMPTY ACCORDING TO THE CAR ESTIMATE. AT EACH FILL UP IT TAKES BETWEEN 12.5 AND 13.5 GALLONS. IT IS NOT CLEAR IF THE TANK IS FILLING UP COMPLETELY AND THERE ARE 4-5 GALLONS LEFT AT 'EMPTY' OR THE TANK IS NOT ABLE TO FILL COMPLETELY. I PURCHASED THIS CAR FOR IT'S FUEL ECONOMY AND RANGE WHILE TRAVELING WITH MY FAMILY. IT IS IMPORTANT TO KNOW IF THE TANK IS ACTUALLY EMPTY OR STILL HAS SUBSTANTIAL AMOUNT OF FUEL REMAINING SO MY FAMILY IS NOT STRANDED OUT OF FUEL.

f. **DATE COMPLAINT FILED:** December 30, 2020
   **NHTSA/ODI ID:**    11385688
   **DATE OF INCIDENT:**    December 30, 2020
   **VIN:**    5DTGBRCH6MS****
   **SUMMARY:** 2 ISSUES- THE DISTANCE TO EMPTY ONLY READS 425 MILES. WITH A FULL 17 GALLON TANK IT SHOULD BE AROUND 600. WHEN YOU FILL IT, IT CLICKS OFF 3-4 GALLONS SHORT OF FULL, ONLY HOLDING ABOUT 14 GALLONS. THE FUEL GAUGE SHOWS FULL. I THEN HAD

TO TRICKLE IN THE REMAINING 3.5 GALLONS. HOW COULD IT SHOW FULL WITH 3.5 MORE GALLONS GOING IN? WHY IS THE TANK NOT ABLE TO TAKE THE FULL AMMOUNT OF FUEL?

85.    Highlander owners also reported the Fuel Tank Defect in online forums:

a.  On ToyotaNation.com, on a thread titled "2020 Hybrid Fuel Tank Issue" a consumer posted the following on April 24, 2020:[16]

Have any other 2020 Highlander Hybrid (AWD) owners having issues with filling the fuel tank all the way or the DTE display showing much less than it should?

When I took delivery of my 2020 Highlander Hybrid last month I was concerned that the "Distance to Empty" display read only 420 miles. I asked the salesman if this was right and she confirmed that the fuel capacity of the vehicle was 17.1 gallons and the MPG is rated at 35 so the range should be about 600 miles. Then she said that it might take a while for the computer to reset and show the correct DTE.

I've only driven the vehicle 725 miles since I got it due to Covid-19 restrictions, and while it's averaging 35.6 miles per gallon (mostly ECO mode), the vehicle only shows about 420 miles DTE when refueled. This week I specifically waited for the low fuel light to go on and drove a few miles past just for good measure. I went to the gas station and only could pump 12 gallons before the pump shut off. I tried topping off the tank and eeked 12.5 gallons into the tank and showed DTE of 445 miles – far less than the 609 miles I expected.

I took the vehicle back to the dealership and explained the problem. They checked for error codes, software updates, recalls and TSBs and found nothing. They noted that that were no issues. I called Toyota corporate and was told the same thing - no issues reported.

I did some research ("Google") and found that 2019/2020 RAV4 Hybrids with the same new "saddle" tank design are having the same problem I'm experiencing. Apparently, the new tank design is

[16] https://www.toyotanation.com/threads/2020-hybrid-fuel-tank-issue.1677254/ (last visited June 8, 2021).

required to accommodate the hybrid drivetrain and won't fill all the way. RAV4 owners can fill about 9 to 10 gallons of the 14.5 gallon tank – pretty consistent with what I'm getting with 12 gallons of the 17 gallon tank capacity.

I'm pretty sure there's a design defect in the Highlander Hybrid fuel tank preventing the last five gallons of gas being pumped thus cheating me out of 180 miles of range.

While Toyota has acknowledged an issue with the RAV4 and are working on a fix, they haven't acknowledged a problem with the Highlander yet. I guess I might have to join the RAV4 class action lawsuit in order to get satisfaction?

b. On May 2, 2020, a user named Hylanderhybrid fan responded to the above post:[17]

Yep..... Having issues. I just traded in a RAV4 Hybrid Limited for a 2020 XLE AWD Hybrid Highlander. Although I did have gas filling issues with RAV4 reason for trading in was size ( for increase in family). Today went to fill up with tank Until Empty at 77 miles and tank clicked off at 9.2 gallons. I had that same feeling like RAV4. Was able to put in additional 4 gallons to 13 until gas started gushing out. Until Empty until 440 miles ???? Here we go again. I love the highlander by the way. Drives much smoother than RAV4.

c. On ToyotaNation.com, on a thread titled "2021 Toyota Highlander Hybrid Tank issue" a consumer posted the following on April 17, 2021:[18]

Hello,

I had tried to fill my tank from low fuel warning (~2.6 gal) to top off is around 12-12.5 gal with multiple gas stations. Toyota spec said the tank capacity is 17.1 gal which is couple gallons off for my car. I am not sure whether the gauge has issue or tank shape is problematic that prevented to get 17.1 gal. I submitted ticket to NHTSA for this issue and saw many people posted the

---

[17] https://www.toyotanation.com/threads/2020-hybrid-fuel-tank-issue.1677254/post-14235428

[18] https://www.toyotanation.com/threads/2021-toyota-highlander-hybrid-tank-issue.1697464/ (last visited June 8, 2021).

same issue. I called Toyota today to create a case for this issue but customer service claimed there is no report for this issue. It is similar to RAV4 Hybrid issue.

Does anybody know how to fix this issue? Is there anything else that I need to do to fix it?

If you have the same issue for 2021 Model Highlander Hybrid, then please help to file the case with Toyota and NHTSA and hope they will do something about it. Thanks.

d.  On April 17, 2021, a user named JBandit03 responded to the

above post:

Yes, and I'm annoyed that Toyota wants you to call to complain about an issue vs being able to submit an email as before. But, if you check out the hybrid forum, there's a stickied post at the top about it.

e.  On Edmunds.com, a consumer posted the following on May 9,

2020:[19]

**** New Vehicle Review**. Will post further reviews with miles but have to say I'm very happy so far.  I traded in my Rav-4 Hybrid Limited-2019 since our family grew and we needed extra space for the inlaws..... (tip#1: never trade in to a dealer but everyone knows that). Purchased an XLE and wow.  The ride and drive is in my opinion is much more than the Rav-4.   It glides.  Also the vehicle is "solid" and much more sturdier than the Rav-4.   Seats are more comfortable as well.    Yes the third row seat bench is small but the Captain Chairs on second row move forward.  It will work well.  I'll post further updates on mileage.

** One concern though is when I fill the gas tank it shut off at 11 gallons but has 17.1.  I had nurse about 3 gallons.  As you've read, Rav 4 Hybrid's had this gas tank issue so will keep an eye on this**

*********************************UPDATED JUNE 30 2020/ 2500 MILE REVIEW***************

Posted a previous Review when we first purchased the vehicle.  Again, I traded in our Rav4 Hybrid for increase in size.   Overall so far has mostly positives with few

_____

[19] https://www.edmunds.com/toyota/highlander-hybrid/2020/consumer-reviews/ (last visited June 8, 2021).

negatives.....  but I will say we are only at 31.2 mpg overall with the Odometer.....so no where close to the advertised 35/36 MPG for the Hybrid.

Positives:

-Ride and comfort.  Rides much smoother than the Rav4 Hybrid and seats are also more comfortable .

-More room.  Yes the 3rd row is not for long road trips and really made for smaller adults (5'4) and kids.....but it's extra room if you need it and works for our kids.  If your are tall it would be a challenge to sit there for any length of time.

Negatives:

-Not getting the MPG I was anticipating.   31.3 overall.....I've also noticed compared to my Rav 4 Hybrid that the EV mode does not flip on as much?   So disappointed on that end.  I'm not sure if Toyota plans on a Plug In Highlander....that would be great!

So overall happy with our choice.  I'm thinking I should have waited to see if a Plug In Highlander is in the works but would be a while yet.   Nice, comfortably and safe ride.  Will keep you updated with the miles.

********   UPDATED   5,000   MILE   REVIEW SEPTEMBER 24,2020****

Just updating review.  I really enjoy this vehicle to date. MPG still 32-33.... mixed driving with best at 34 so close to Rated MPG.  Very comfortable ride and still happy on purchase.  Wish list would be plug in vs all EV Highlander!!

If families would recommend bench seat on second row for kids....!

    f.  For instance, on kbb.com, a consumer posted the following on

      April 2, 2021:[20]

The Pros: Nice car, rides great, very smooth. I have the XLE which has a lot of nice regular &#38; safety features. The front seat is very comfortable, and with great adjustments. The car is overall a decent size. I don't use the far back seat so I wouldn't know about the legroom, the second row is very roomy. The trunk is larger than my previous 2016 Highlander. The 4 cylinder

---

[20] https://www.kbb.com/toyota/highlander-hybrid/ (last visited June 8, 2021).

engine makes more noise than the 6 cylinder, at first it was annoying but I got used to it. It has 3 different modes for driving, ECO, normal and sport. I was a little worried about the response and get up and go, but if you put it in sport mode it goes, at the expense of gas mileage I'm sure, normal mode is pretty good as well, not sure what happens with the gas mileage in that mode so I tend to keep it in ECO. The safety features are great, blind spot monitoring, lane assist and intelligent cruise control to begin with are nice to have. The Cons: The navigation package is awful, I keep using my phone and on the last trip google maps beat it by 15 minutes. Plus if a phone call comes in its hard to get the directions while on a call. I tried the Android Auto and it really limits what you can do while you are driving so much to me it is not worth it. I might need to learn how to use it better but that is my first impression. My biggest pet peeve and complaint is the range and gas tank size, they specify a 17.1 gallon gas tank which if the mileage is correct would give you a range of around 600 miles. I was only getting 12.5 - 13 gallons in the tank when it said 0 miles to empty and a range of around 450 miles. Thinking something was wrong I brought it to the dealer who checked it out and called Toyota, Toyota said (according to my dealer) yes, we say 17.1 gallons but you'll only get 14 gallons into it. I haven't been able to get 14 gallons into it. They said it's 17.1 gallons but the configuration of the car only allows you to put 14 gallons at most into. Now I'm not happy. The range is one of the reasons I bought this car, otherwise I might have bought a 3 row KIA or Hyundai. What's next? Lemon law, join a class action like the RAV4 Hybrid, or live with it.

86.     The existence of the Fuel Tank Defect is a material fact that a reasonable consumer would consider when deciding whether to purchase or lease a Class Vehicle. Had Plaintiffs and other Class Members known of the Fuel Tank Defect, they would have paid less for the Class Vehicles or would not have purchased or leased them.

87.     Reasonable consumers, like Plaintiffs, reasonably expect that a vehicle's fuel systems are safe, will function in a manner that will not pose a safety risk, and are free of defects, all of which were not true with respect to the fuel systems in the Class Vehicles. They also expected that the Class Vehicles would be fit for the ordinary purpose of being capable of being fully fueled and would confirm to the promises and affirmations on their window stickers which

they could not due to the Fuel Tank Defect. Plaintiffs and Class Members further reasonably expected that Toyota would not sell or lease vehicles with known safety defects which can increase emissions and present a overflow risk during fueling, such as the Fuel Tank Defect, and will disclose any such defects to its consumers when it learns of them. They did not expect Toyota to fail to disclose the Fuel Tank Defect to them and to continually deny it.

**Toyota Has Actively Concealed the Fuel Tank Defect**

88.    Despite knowing of the existence of the Fuel Tank Defect, Toyota has and continues to market the Class Vehicles as having a 17.1 capacity fuel tank, displaying the vehicles with window stickers which show a range of 616 miles per tank, and advertises about the range and other fuel efficient advantages of the Class Vehicles.

89.    In the brochure for the Class Vehicles, Toyota lists the fuel capacity of the gas tank to be 17.1 gallons.

90.    When customers call or email Toyota Customer Care to complain that their fuel tanks cannot be filled more than 14.5 gallons and that their DTE, at most, reaches 400 or 500 miles, despite Toyota's representations and advertising its 17.1 gallon capacity and DTE of over 600 miles, Toyota initially obfuscates the issue. For example, Toyota tells customers:

> Fuel efficiency is influenced by many variables including, but not limited to, quality and octane level of gasoline, fuel additives or seasonal variations in fuel, load carried in vehicle, tire pressure, terrain, location (urban/suburban), driving style, and even weather conditions. Keep in mind when refueling your vehicle, that different gas station maybe calibrated differently resulting in varied miles to empty.

> Additionally, one way you may wish to try to estimate your driving range would be to determine your real-life miles-per-gallon, and multiply that by the number of gallons it takes to fill your tank. For example, if you normally get 25 miles per gallon and it takes ten gallons to fill your tank, you can estimate an approximate driving range of 250 miles.

91.     When pressed, Toyota eventually admits the Fuel Tank Defect to customers, stating:

> We apologize for the confusion pertaining to your 2021 Toyota Highlander Hybrid. The Highlander has a fuel tank with a 17.1 gallon capacity, and approximately 14.2 gallons of a it useable. The fuel pick-up line is not at the bottom of the fuel tank, so that residual fuel does not get into the engine. The residual fuel can possibly be contaminated with debris, water, etc.
>
> Additionally, if you feel that your vehicle is not providing a [sic] accurate account of the fuel that is being used. We would recommend have your local Toyota dealer inspect your vehicle for any concerns.

92.     Yet Toyota has refused to date to provide any notice to consumers, owners and lessees—including Class Members—about the Defect or when they can expect a repair for the Defect.

93.     Toyota also continues to deceptively list the fuel capacity of Class Vehicles as 17.1 gallons, without mentioning that consumers may not be able to fill their fuel tanks to capacity.

94.     Despite its knowledge of the Fuel Tank Defect in the Class Vehicles, Toyota actively concealed the existence and nature of the defect from Plaintiffs and Class Members and failed to issue a Technical Tip or TSB to its dealerships informing them that they should acknowledge the problem and reveal it to prospective buyers.

95.     Nor has Toyota revised its advertising or informed potential purchasers and lessees that the fuel tank cannot be filled to capacity and comes with a corresponding safety risk.

96.     Specifically, Toyota failed to disclose or actively concealed at and after the time of purchase, lease, or repair:

(a)     any and all known material defects or material nonconformity

of the Class Vehicles, including the defects pertaining to the
fuel systems;

(b)    that the Class Vehicles, including the fuel systems, were
unsafe, not in good in working order, were defective, were in
need of repair and possibly recalibration or other software
mechanisms, and were not fit for their intended or particular
purposes; and

(c)    that the Class Vehicles and the fuel systems were defective,
despite the fact that Toyota learned of such defects as early as
2018 during pre-production testing.

### The Agency Relationship Between Toyota Motor Sales, U.S.A., Inc., and its Network of Authorized Dealerships

97.    In order to sell vehicles to the general public, TMS enters into
agreements with its nationwide network of authorized dealerships to engage in
retail sales with consumers such as Plaintiffs. In return for the exclusive right to
sell new, TMS-branded vehicles, the authorized dealerships are also permitted
under these agreements with TMS to service and repair these vehicles under the
warranties TMS provides directly to consumers who purchased new vehicles
from the authorized dealerships. Accordingly, TMS's authorized dealerships are
TMS's agents, and the consumers who purchase or lease TMS vehicles are the
third-party beneficiaries of these dealership agreements, which allow the
consumers to purchase and service their TMS vehicles locally. Because Plaintiffs
and members of the Class there are third-party beneficiaries of the dealership
agreements which create the implied warranty, they may avail themselves of the
implied warranty. This is true because third-party beneficiaries to contracts
between other parties that create an implied warranty of merchantability may
avail themselves of the implied warranty. *See In re Toyota Motor Corp.*

*Unintended Acceleration Mktg., Sales Practices, & Prod. Liab. Litig.*, 754 F. Supp. 2d 1145, 1185 (C.D. Cal. 2010).

98.     Further, Plaintiffs and each of the members of the Class are the intended beneficiaries of TMS's express and implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles, and they have no rights under the warranty agreements provided by TMS. TMS's warranties were designed for and intended to benefit the consumers only. The consumers are the true intended beneficiaries of TMS's express and implied warranties, and the consumers may therefore avail themselves of those warranties.

99.     TMS issued the express warranty to the Plaintiffs and the Class members. TMS also developed and disseminated the owner's manual and warranty booklets, advertisements, and other promotional materials relating to the Class Vehicles. TMS also is responsible for the content of the Monroney Stickers on TMS-branded vehicles. Because TMS issues the express warranty directly to the consumers, the consumers are in direct privity with TMS with respect to the warranties

100.   In promoting, selling, and repairing its defective vehicles, TMS acts through numerous authorized dealers who act, and represent themselves to the public, as exclusive TMS representatives and agents. That the dealers act as TMS's agents is demonstrated by the following facts:

> (d)    The authorized Toyota dealerships complete all service and repair according to TMS's instructions, which TMS issues to its authorized dealerships through service manuals, technical service bulletins ("TSBs"), technical tips ("TT"), and other documents;
>
> (e)    Consumers are able to receive services under TMS's issued

New Vehicle Limited Warranty only at TMS's authorized dealerships, and they are able to receive these services because of the agreements between TMS and the authorized dealers. These agreements provide TMS with a significant amount of control over the actions of the authorized dealerships;

(f)     The warranties provided by TMS for the defective vehicles direct consumers to take their vehicles to authorized dealerships for repairs or services.

(g)     TMS dictates the nature and terms of the purchase contracts entered into between its authorized dealers and consumers;

(h)     TMS controls the way in which its authorized dealers can respond to complaints and inquiries concerning defective vehicles, and the dealerships are able to perform repairs under warranty only with TMS's authorization.

(i)     TMS has entered into agreements and understandings with its authorized dealers pursuant to which it authorizes and exercises substantial control over the operations of its dealers and the dealers' interaction with the public; and

(j)     TMS implemented its express and implied warranties as they relate to the defects alleged herein by instructing authorized TMS dealerships to address complaints of the Defect by prescribing and implementing the relevant TSBs cited herein.

101.   Indeed, Toyota's warranty booklets make it abundantly clear that Toyota's authorized dealerships are Toyota's agents for vehicle sales and service. The booklets, which are plainly written for the consumers, not the dealerships, tell the consumers repeatedly to seek repairs and assistance at its

"authorized dealerships." For example, at the outset, Toyota notifies Plaintiffs and class members in the warranty booklet that coverage applies only to vehicles "**originally sold by an authorized dealer**" and that **"[t]he decision whether a part would be repaired or replaced will be made by the servicing Toyota dealership and/or Toyota."** Further, the booklets state "Both Toyota and your Toyota dealer are dedicated to serving your automotive needs." The booklets direct Plaintiffs and class members, should they have a problem or concern, to first "discuss the situation with a dealership manager, such as the service manager or customer relations manager. In most cases, a satisfactory solution can be reached at this step." Toyota than directs Plaintiffs and class members: "If the dealership does not address your concern to your satisfaction, to "call the Toyota Customer Experience Center" and notify Toyota of the VIN number, the mileage, and "the name of your Toyota dealership." Then, "A Toyota customer relations representative will assist you in working with the dealership to find a satisfactory solution."

102.   Additionally, the transportation assistance component of the New Vehicle Limited Warranty, which provides transportation assistance if the vehicle must be kept overnight for warranty-covered repairs, applies only to vehicles "sold and serviced by authorized Toyota dealerships…"

103.   Accordingly, as the above paragraphs demonstrate, the authorized dealerships are agents of TMS. Plaintiffs and each of the members of the Class have had sufficient direct dealings with either TMS or its agent dealerships to establish privity of contract between TMS, on one hand, and Plaintiffs and each of the members of the Class, on the other hand. This establishes privity with respect to the express and implied warranty between Plaintiffs and TMS.

## CLASS ACTION ALLEGATIONS

104.   Plaintiffs bring this lawsuit as a class action on behalf of themselves

and all others similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

105. The Class and Sub-Class are defined as:

> **Class**: All individuals in the United States who purchased or leased a 2020 to 2021 Toyota Highlander Hybrid vehicle.

> • **California Sub-Class**: All members of the Class who reside in or purchased their Class Vehicles in the State of California.

> • **CLRA Sub-Class**: All members of the Class who are "consumers" within the meaning of California Civil Code § 1761(d).

> • **Implied Warranty Sub-Class**: All members of the Class who purchased or leased their vehicles in the State of California.

> • **Texas Sub-Class**: All members of the Class who reside in or purchased their Class Vehicles in the State of Texas.

106. Excluded from the Class and Sub-Classes are: (1) Defendants, any entity or division in which Defendants has a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; (3) any Judge sitting in the presiding state and/or federal court system who may hear an appeal of any judgment entered; and (4) those persons who have suffered personal injuries as a result of the facts alleged herein. Plaintiffs reserves the right to amend the Class and Sub-Class definitions if discovery and further investigation reveal that the Class and Sub-Class should be expanded or otherwise modified.

107. <u>Numerosity</u>: Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, that discovery will show that, tens of thousands of Class Vehicles have sold in the

1   United States, and thousands within California.  The number is great enough

2   such that joinder is impracticable. The disposition of the claims of these Class

3   Members in a single action will provide substantial benefits to all parties and to

4   the Court. The Class Members are readily identifiable from information and

5   records in Defendants' possession, custody, or control, as well as from records

6   kept by the Department of Motor Vehicles.

7        108.  <u>Typicality</u>: Plaintiffs' claims are typical of the claims of the Class in

8   that Plaintiffs, like all Class Members, purchased or leased a Class Vehicle

9   designed, manufactured, and distributed by Toyota. The representative Plaintiffs,

10   like all Class Members, have been damaged by Defendants' misconduct in that

11   they have incurred or will incur the cost of repairing or replacing the defective

12   fuel systems. Furthermore, the factual bases of Toyota's misconduct are common

13   to all Class Members and represent a common thread resulting in injury to the

14   Class.

15        109.  <u>Commonality</u>: There are numerous questions of law and fact

16   common to Plaintiffs and the Class that predominate over any question affecting

17   Class Members individually. These common legal and factual issues include the

18   following:

19            (a)   Whether Class Vehicles suffer from the Fuel Tank Defect;

20            (b)   Whether the defects relating to the fuel system constitute an

21                    unreasonable safety risk;

22            (c)   Whether Defendants have knowledge of the Fuel Tank Defect

23                    and, if so, how long Defendants has known of the defect;

24            (d)   Whether the defective nature of fuel tank constitutes a

25                    material fact;

26            (e)   Whether Defendants has a duty to disclose the Fuel Tank

27                    Defect to Plaintiffs and Class Members;

28

(f)   Whether Plaintiffs and the other Class Members are entitled to equitable relief, including a preliminary and/or permanent injunction;

(g)   Whether Defendants knew or reasonably should have known of the Fuel Tank Defect before they sold and leased Class Vehicles to Class Members;

(h)   Whether Defendants should be declared financially responsible for notifying the Class Members of problems with the Class Vehicles and for the costs and expenses of repairing and replacing the defective fuel system;

(i)   Whether Defendants are obligated to inform Class Members of their right to seek reimbursement for having paid to diagnose, repair, or replace their defective fuel systems;

(j)   Whether Defendants breached the implied warranty of merchantability pursuant to the Magnuson-Moss Warranty Act;

(k)   Whether Defendants breached the implied warranty of merchantability pursuant to the Song-Beverly Act;

(l)   Whether Defendants breached their express warranties under UCC section 2301;

(m)   Whether Defendants breached the Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq*.;

(n)   Whether Defendants breached the Unfair Competition Law, Cal. Bus.  Prof. Code § 17200, *et seq*.; and

(o)   Whether damages, restitution, equitable, injunctive, compulsory or other relief are warranted.

110.   <u>Adequate Representation</u>: Plaintiffs will fairly and adequately

1    protect the interests of the Class Members. Plaintiffs have retained attorneys

2    experienced in the prosecution of class actions, including consumer and product

3    defect class actions, and they intend to prosecute this action vigorously.

4        111.   <u>Predominance and Superiority</u>: Plaintiffs and Class Members have

5    all suffered and will continue to suffer harm and damages as a result of

6    Defendants' unlawful and wrongful conduct. A class action is superior to other

7    available methods for the fair and efficient adjudication of the controversy.

8    Absent a class action, most Class Members would likely find the cost of

9    litigating their claims prohibitively high and would therefore have no effective

10   remedy. Because of the relatively small size of the individual Class Members'

11   claims, it is likely that only a few Class Members could afford to seek legal

12   redress for Defendants' misconduct. Absent a class action, Class Members will

13   continue to incur damages, and Defendants' misconduct will continue without

14   remedy or relief.  Class treatment of common questions of law and fact would

15   also be a superior method to multiple individual actions or piecemeal litigation in

16   that it will conserve the resources of the courts and the litigants and promote

17   consistency and efficiency of adjudication.

## FIRST CAUSE OF ACTION

## FRAUD

## (On Behalf of the Class or, Alternatively, on Behalf of the California Sub-Class and the Texas Sub-Class Against All Defendants)

22       112.   Plaintiffs incorporate by reference the allegations contained in

23   paragraphs 1 through 122, *supra*.

24       113.   Plaintiffs bring this cause of action on behalf of themselves and the

25   Class, or, alternatively, Plaintiffs Cheryl and Paulo Tavares bring this cause of

26   action individually and on behalf of the California Sub-Class, and Charles

27   Deffendall brings this cause of action individually and on behalf of the Texas

28

1    Sub-Class.

2        114.   Defendants intentionally and knowingly misrepresented material

3    facts and concealed, suppressed, and/or omitted material facts including the

4    capacity of the fuel tank and the standard, quality or grade of the Class Vehicles

5    and the fact that the Class Vehicles contain a Fuel Tank Defect and

6    corresponding safety risk, with the intent that Plaintiffs and members of the

7    Class rely on Defendants' misstatements and omissions.  As a direct result of the

8    Defendants' fraudulent conduct, Plaintiffs and members of the Class have

9    suffered actual damages.

10       115.   Defendants knew at the time of sale or lease and thereafter that the

11   Class Vehicles contained the Fuel Tank Defect, misrepresented the MPGs and

12   the range of the Class Vehicles, and concealed the defect and never intended to

13   repair or replace the defective fuel system during the warranty periods.  To date,

14   Defendants have not provided Plaintiffs and members of the Class with a repair

15   or remedy for the Fuel Tank Defect.

16       116.   Defendants owed a duty to disclose the Fuel Tank Defect and its

17   corresponding safety risk to Plaintiffs and the members of the Class because

18   Defendants possessed superior and exclusive knowledge regarding the defect.

19   Further, Defendants had a duty to disclose any information relating to the safety,

20   quality, functionality and reliability of Class Vehicles because they consistently

21   marketed the Class Vehicles as having a fuel capacity of 17.1 gallons, able to

22   achieve certain MPGs and have an extended range as a result, and offer

23   consumers safe, reliable transportation.

24       117.   Once Defendants made representations to the public about safety,

25   quality, functionality, and reliability, Defendants were under a duty to disclose

26   these omitted facts, because where one does speak one must speak the whole

27   truth and not conceal any facts which materially qualify those facts stated.  One

28

1    who volunteers information must be truthful, and the telling of a half-truth

2    calculated to deceive is fraud.  Rather than disclose the defect, or that the effect

3    of the defect was a significant reduction in the fuel capacity of the Class

4    Vehicles, Defendants intentionally and knowingly concealed, suppressed and/or

5    omitted material facts including the standard, quality or grade of the Class

6    Vehicles and the presence of the Fuel Tank Defect and corresponding safety risk,

7    to sell additional Class Vehicles and avoid the cost of repair or replacement.

8        118.   The Fuel Tank Defect is material to Plaintiffs and the members of

9    the Class because Plaintiffs and the members of the Class had a reasonable

10   expectation that the vehicles would not contain a defect that prevents them from

11   filling their gas tanks to capacity, that limits the utility of the vehicle, and that

12   exposes them and others to a safety risk.  No reasonable consumer expects a

13   vehicles to contain a concealed defect in design, manufacture, materials or

14   workmanship, such as the Fuel Tank Defect as well as its associated safety risk.

15       119.   Plaintiffs and members of the Class would not have purchased or

16   leased the Class Vehicles but for Defendants' misrepresentations, omissions, and

17   concealment of material facts regarding the nature and quality of the Class

18   Vehicles and the existence of the Fuel Tank Defect and corresponding safety

19   risk, or would have paid less for the Class Vehicles.

20       120.   Defendants knew their misstatements about the Class Vehicles' fuel

21   capacity, MPGs, and range, as well as their concealment and suppression of the

22   existence of the Fuel Tank Defect was false and misleading and knew the effect

23   of concealing those material facts.  Defendants knew their misstatements,

24   concealment, and suppression of the Fuel Tank Defect would sell more Class

25   Vehicles and would discourage Plaintiffs and the members of the Class from

26   seeking replacement or repair of the Fuel Tank Defect during the applicable

27   warranty periods.  Further, Defendants intended to induce Plaintiffs and the

28

members of the Class into purchasing or leasing the Class Vehicles and to discourage them from seeking replacement or repair of the Fuel Tank Defect in order to decrease costs and increase profits.

121.   Defendants acted with malice, oppression and fraud.

122.   Plaintiffs and the members of the Class reasonably relied upon Defendants' knowing misrepresentations, concealment and omissions.  As a direct and proximate result of Defendants' misrepresentations, omissions and active concealment of material facts regarding the Fuel Tank Defect and the associated safety risk, Plaintiffs and the members of the Class have suffered actual damages in an amount to be determined at trial.

**SECOND CAUSE OF ACTION**

**VIOLATION OF CALIFORNIA'S CONSUMERS**

**LEGAL REMEDIES ACT,**

**CALIFORNIA CIVIL CODE § 1750, *ET SEQ*.**

**(On Behalf of California Plaintiffs and the CLRA Sub-Class Against All Defendants)**

123.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 122, *supra*.

124.   Plaintiffs Cheryl and Paulo Tavares ("California Plaintiffs") brings this cause of action individually on behalf of and the Class, or, alternatively, the CLRA Sub-Class.

125.   Defendants are "persons" as defined by California Civil Code § 1761(c).

126.   California Plaintiffs and CLRA Sub-class Members are "consumers" within the meaning of California Civil Code § 1761(d) because they purchased their Class Vehicles primarily for personal, family, or household use.

127.   By failing to disclose and concealing the defective nature of the fuel systems from California Plaintiffs and prospective Class Members, Toyota violated California Civil Code § 1770(a), as it represented that the Class Vehicles and their fuel tanks had characteristics and benefits that they do not have and represented that the Class Vehicles and their fuel systems were of a particular standard, quality, or grade when they were of another. *See* Cal. Civ. Code §§ 1770(a)(5) & (7).

128.   Toyota's unfair and deceptive acts or practices occurred repeatedly in Toyota's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

129.   Toyota knew that the Class Vehicles and their fuel systems suffered from an inherent defect, were defectively designed, and were not suitable for their intended use.

130.   Because of their reliance on Toyota's misstatements about the capacity of the fuel tank and omissions regarding the existence of the Fuel Tank, owners and/or lessees of the Class Vehicles, including California Plaintiffs, suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, because of the Fuel Tank Defect, California Plaintiffs and Class Members were harmed and suffered actual damages in that the Class Vehicles' fuel systems are substantially certain to require repair and/or replacement.

131.   Toyota was under a duty to California Plaintiffs and Class Members to disclose the defective nature of the fuel system and/or the associated safety risk because:

(a)   Toyota was in a superior position to know the true state of facts about the Fuel Tank Defect in Class Vehicles;

(b)   California Plaintiffs and Class Members could not reasonably

have been expected to learn or discover that the fuel system in Class Vehicles had a dangerous safety defect until it manifested; and

(c)    Toyota knew that California Plaintiffs and Class Members could not reasonably have been expected to learn of or discover the Fuel Tank Defect.

132.   In advertising and continuing to advertise that the Class Vehicles had a 17.1 gallon fuel capacity with a concomitant range, Toyota knowingly and intentionally misrepresented the true nature of the Class Vehicles.

133.   In failing to disclose the defective nature of fuel system, Toyota knowingly and intentionally concealed material facts and breached its duty not to do so.

134.   The facts Toyota misstated to, concealed from, or failed to disclose to California Plaintiffs and Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Class Vehicles or whether to pay less for the Class Vehicles.  Had California Plaintiffs and Class Members known that the Class Vehicles' fuel systems were defective, they would not have purchased or leased the Class Vehicles or would have paid less for them.

135.   California Plaintiffs and Class Members are reasonable consumers who do not expect the fuel systems installed in their vehicles to exhibit problems such as the Fuel Tank Defect. This is the reasonable and objective consumer expectation relating to a vehicle's fuel tank and its ability to be filled to capacity.

136.   Because of Toyota's conduct, California Plaintiffs and CLRA Class Members were harmed and suffered actual damages in that, as discovery will show, the Class Vehicles experienced and will continue to experience problems such as the Fuel Tank Defect.

137.   As a direct and proximate result of Defendants' unfair or deceptive acts or practices, California Plaintiffs and CLRA Class Members suffered and will continue to suffer actual damages.

138.   California Plaintiffs and the CLRA Class are entitled to equitable relief.

139.   As of June 8, 2021, California Plaintiffs and California Sub-class Members provided Defendants with notice of their violations of the CLRA pursuant to California Civil Code § 1782(a). If, within 30 days of the date of the notification letter, Defendants fail to provide appropriate relief for their violation of the CLRA, Plaintiff will amend this Complaint to seek monetary, compensatory, and punitive damages, in addition to the injunctive and equitable relief she seeks now.

## THIRD CAUSE OF ACTION

## VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200, *ET SEQ*.

## (On Behalf of California Plaintiffs and the California Sub-Class Against All Defendants)

140.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 122, *supra*.

141.   California Plaintiffs bring this cause of action individually and on behalf of the Class, or, alternatively, on behalf of the California Sub-Class.

142.   Because of their reliance on Toyota's misstatements and omissions, owners and/or lessees of the Class Vehicles, including California Plaintiffs, suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, because of the Fuel Tank Defect, California Plaintiffs and California Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' fuel systems are substantially certain to require repair or

1   replacement well before the end of the design life of the components.

2   143.   California Business & Professions Code § 17200 prohibits acts of

3   "unfair competition," including any "unlawful, unfair or fraudulent business act

4   or practice" and "unfair, deceptive, untrue or misleading advertising."

5   144.   California Plaintiffs and California Sub-Class Members are

6   reasonable consumers who do not expect their fuel systems to exhibit the

7   symptoms of the Fuel Tank Defect.

8   145.   Toyota knew the Class Vehicles and their fuel systems would be

9   defective in design, materials, manufacture, and/or workmanship, would fail

10  prematurely, and were not suitable for their intended use.

11  146.   In failing to disclose the Fuel Tank Defect, Toyota has knowingly

12  and intentionally concealed material facts and breached its duty not to do so.

13  147.   Toyota was under a duty to California Plaintiffs and Class Members

14  to disclose the defective nature of the Class Vehicles and their fuel systems

15  because:

16      (a)   Toyota was in a superior position to know the true state of

17             facts about the defect in the Class Vehicles' fuel systems;

18      (b)   The Fuel Tank Defect poses a safety risk to California

19             Plaintiffs and the California Sub-Class; and

20      (c)   Toyota actively concealed the defective nature of the Class

21             Vehicles and their fuel systems from California Plaintiffs and

22             the California Sub-Class.

23  148.   The facts Toyota misstated, concealed from, or failed to disclose to

24  California Plaintiffs and California Sub-Class Members are material in that a

25  reasonable person would have considered them to be important in deciding

26  whether to purchase or lease Class Vehicles. Had they known of the Fuel Tank

27  Defect, California Plaintiffs and the other California Sub-Class Members would

28

have paid less for the Class Vehicles or would not have purchased or leased them at all.

149.   Toyota continued to deny and conceal the defective nature of the Class Vehicles and their fuel systems even after Class Members began to report problems.  Toyota also continues to represent that the fuel capacity of the Class Vehicles is 17.1 gallons.

150.   Toyota's conduct was and is likely to deceive consumers.

151.   Toyota's acts, conduct, and practices were unlawful, in that they constituted:

(a)   Violations of California's Consumers Legal Remedies Act;

(b)   Violations of the Song-Beverly Consumer Warranty Act;

(c)   Violations of the Magnuson-Moss Warranty Act; and

(d)   Breach of Express Warranty under California Commercial Code section 2313.

152.   By its conduct, Toyota has engaged in unfair competition and unlawful, unfair, and fraudulent business practices.

153.   Toyota's unfair or deceptive acts or practices occurred repeatedly in Defendants' trade or business and were capable of deceiving a substantial portion of the purchasing public.

154.   As a direct and proximate result of Toyota's unfair and deceptive practices, California Plaintiffs and California Sub-Class Members have suffered and will continue to suffer actual damages.

155.   Toyota has been unjustly enriched and should be required to make restitution to California Plaintiffs and the California Sub-Class pursuant to §§ 17203 and 17204 of the Business & Professions Code.

**FOURTH CAUSE OF ACTION**

**BREACH OF IMPLIED WARRANTIES**

**PURSUANT TO SONG-BEVERLY CONSUMER WARRANTY ACT,**

**CALIFORNIA CIVIL CODE §§ 1792 AND 1791.1, *ET SEQ.***

**(On Behalf of California Plaintiffs and the Implied Warranty Sub-Class**

**Against All Defendants)**

156.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 122, *supra*.

157.   California Plaintiffs bring this cause of action against all Defendants individually and on behalf of the Implied Warranty Sub-Class.

158.   Toyota was at all relevant times the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. Toyota knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased because the Class Vehicles are hybrid vehicles.

159.   Toyota provided California Plaintiffs and Implied Warranty Sub-Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable, pass without objection in the trade, are fit for the ordinary purposes for which they were sold, are adequately labeled, and conform to the promises and affirmations on the label.  However, the Class Vehicles are not merchantable because they are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, *inter alia*, the Class Vehicles and their fuel systems suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.  The Class Vehicles would not pass without objection in the trade, are not adequately labeled and do not comfort the promises and affirmations on the label because the fuel capacity of the Class Vehicles is not 17.1 gallons and the range of the Class Vehicle does not approach 615 miles as a

1    result.

2        160.   Toyota impliedly warranted that the Class Vehicles were of

3    merchantable quality and fit for their intended use.  This implied warranty

4    included, among other things: (i) a warranty that the Class Vehicles and their

5    fuel systems, which were manufactured, supplied, distributed, and/or sold by

6    Toyota, would provide safe and reliable transportation; (ii) a warranty that the

7    Class Vehicles and their fuel systems would be fit for their intended use; (iii) that

8    the Class Vehicles and their fuel systems would pass without objection in the

9    trade; (iv) that Class Vehicles are adequately labeled; and (v) that Class Vehicles

10   would conform the promises and affirmations on their labels.

11       161.   Toyota impliedly warranted that the Class Vehicles were fit for their

12   particular purpose of providing the fuel efficiency and range expected of a

13   hybrid vehicle with a 17.1 gallon fuel tank.  Toyota knew that California

14   Plaintiffs and the Implied Warranty Sub-Class had reason to know that the Class

15   Vehicles were required for this particular purpose.  Toyota also knew that

16   California Plaintiffs and the Implied Warranty Sub-Class relied on Toyota's skill

17   and judgment to furnish goods suitable for this purpose.

18       162.   As discussed in detail *supra* at ¶¶ 97-103, privity of contract is not

19   required in this case, because Plaintiffs and Class Members are intended third-

20   party beneficiaries of contracts between TMS and its dealerships; specifically,

21   they are the intended beneficiaries of Defendants' implied warranties. Toyota's

22   vehicles are sold to consumers through a network of TMS's authorized

23   dealerships, who are TMS's agents for sales and repairs. The dealers were not

24   intended to be the ultimate consumers of the Class Vehicles, and the warranty

25   agreements were designed for and intended to benefit the ultimate consumers

26   only.

27

28

CLASS ACTION COMPLAINT

163.   Contrary to the applicable implied warranties, the Class Vehicles and their fuel systems at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing California Plaintiffs and Class Members with reliable, durable, and safe transportation, would not pass without objection in the trade, were not adequately labeled, did not conform to the promises and affirmation on their labels, and were not fit for their particular purpose of providing enhanced fuel efficiency and range.  Instead, the Class Vehicles are defective, including the defective fuel systems.

164.   The alleged Fuel Tank Defect is inherent and was present in each Class Vehicle at the time of sale.

165.   Because of Toyota's breach of the applicable implied warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, because of the Fuel Tank Defect, California Plaintiffs and the Implied Warranty Class Members were harmed and suffered actual damages in that the Class Vehicles' fuel systems are substantially certain to fail before the end of their design life.

166.   Toyota's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of California Civil Code §§ 1792 and 1791.1.

## FIFTH CAUSE OF ACTION
## BREACH OF EXPRESS WARRANTY
**(By California Plaintiffs on behalf of the California Sub-Class against Defendant TMS)**

167.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 122, *supra*.

168.   California Plaintiffs brings this cause of action individually on behalf of the Class, or, alternatively the California Sub-class, against TMS.

169.   TMS is and was at all relevant times a "merchant" with respect to motor vehicles under Cal. Com. Code §§ 2104(1) and 10103(c), and a "seller" of motor vehicles under § 2103(1)(d).

170.   With respect to leases, TMS is and was at all relevant times a "lessor" of motor vehicles under Cal. Com. Code § 10103(a)(16).

171.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

172.   TMS provided all purchasers and lessees of the Class Vehicles with an express warranty described *infra*, which became a material part of the bargain. Accordingly, TMS's express warranty is an express warranty under California law.

173.   The fuel systems were manufactured and/or installed in the Class Vehicles by TMS and are covered by the express warranty.

174.   In a section entitled "What is Covered," TMS's express warranty provides in relevant part that "This warranty covers repairs and adjustments needed to correct defects in materials or workmanship of any part supplied by Toyota."

175.   According to TMS, the Basic Warranty coverage for Toyota models "is for 36 months or 36,000 miles, whichever occurs first…" The Powertrain warranty coverage "is for 60 months or 60,000 miles, whichever occurs first." Further, there is a Hybrid System Warranty for 10 years or 150,000 miles for 2020 Class Vehicles and 8 years or 100,000 miles for 2021 Class Vehicles.

176.   TMS breached the express warranties by selling and leasing Class Vehicles with fuel systems that were defective, requiring repair or replacement within the warranty period, and refusing to honor the express warranty by repairing or replacing, free of charge, the defective fuel system and/or its defective components. In addition, when TMS did agree to pay a portion of the

costs, TMS nevertheless breached the express warranty by simply replacing Plaintiffs' and Class Members' defective fuel system components with similarly defective fuel system components, thus failing to "repair" the Fuel Tank Defect.

177.   Plaintiffs and members of the Class have had sufficient direct dealings with either TMS or its agents (dealerships and technical support) to established privity of contract between TMS, on one hand, and Plaintiffs and each of the other Class Members on the other hand.  Nonetheless, privity is not required here because Plaintiffs and each of the other Class Members are intended third-party beneficiaries of contracts between TMS and its distributors and dealers, and specifically, of TMS's express warranties.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

178.   California Plaintiffs were not required to notify TMS of the breach or were not required to do so because affording TMS a reasonable opportunity to cure its breach of written warranty would have been futile. TMS was also on notice of the Fuel Tank Defect from its own pre-production testing, from the early complaints and service requests it received from Class Members, from repairs and/or replacements of fuel system components, and from other internal sources.

179.   TMS was further provided notice of its breach of express warranties by California Plaintiffs by letter dated June 8, 2021.  California Plaintiffs also provided notice of express warranties when they took their Class Vehicle to Dublin Toyota, a Toyota-authorized provider of warranty repairs and called Toyota's Customer Care department to open a case regarding their Fuel Tank Defect complaint.  Despite these notices, TMS failed to cure the breach of express warranties within an adequate time.

180.   As a direct and proximate cause of TMS's breach of express warranties, California Plaintiffs and the other Class Members have suffered, and continue to suffer, damages, including economic damages at the point of sale or lease. Additionally, California Plaintiffs and the other Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

181.   California Plaintiffs and the other Class Members are entitled to legal and equitable relief against TMS, including actual damages, consequential damages, specific performance, attorneys' fees, costs of suit, and other relief as appropriate.

## SIXTH CAUSE OF ACTION
## VIOLATION OF TEXAS DECEPTIVE TRADE PRACTICES - CONSUMER PROTECTION ACT ("TDTPCPA"),
### Tex. Bus. & Com. Code §§ 17.41, *et seq*.
### (By Plaintiff Deffendall on behalf of the Texas Sub-Class against All Defendants)

182.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 122, *supra*.

183.   Plaintiff Charles Deffendall ("Texas Plaintiff") brings this Count individually and on behalf of members of the Texas Sub-Class.

184.   Texas Plaintiff and the members of the Texas Sub-Class are individuals, partnerships or corporations with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets), *see* Tex. Bus. & Com. Code § 17.41, and are therefore "consumers" pursuant to Tex. Bus. & Com. Code § 17.45(4).

185.   Defendants are "persons" within the context of the TDTPCPA. *See* Tex. Bus. & Com. Code § 17.45(3).

1    186.   Defendants engaged in trade and commerce within the context of the

2    TDTPCPA.  *See* Tex. Bus. & Com. Code § 17.46(a).

3    187.   The TDTPCPA prohibits "false, misleading, or deceptive acts or

4    practices in the conduct of any trade or commerce," Tex. Bus. & Com. Code §

5    17.46(a), and an "unconscionable action or course of action," which means "an

6    act or practice which, to a consumer's detriment, takes advantage of the lack of

7    knowledge, ability, experience, or capacity of the consumer to a grossly unfair

8    degree." Tex. Bus. & Com. Code §§ 17.45(5) and 17.50(a)(3).

9    188.   Defendants violated Tex. Bus. & Com. Code § 17.46(b)(1) by

10   "passing off goods or services as those of another[.]"

11   189.   Defendants violated Tex. Bus. & Com. Code § 17.46(b)(5) by

12   "representing that goods or services have sponsorship, approval, characteristics,

13   ingredients, uses, benefits, or quantities which they do not have[.]"

14   190.   Defendants violated Tex. Bus. & Com. Code § 17.46(b)(7) by

15   "representing that goods or services are of a particular standard, quality, or

16   grade, . . . if they are of another[.]"

17   191.   Defendants violated Tex. Bus. & Com. Code § 17.46(b)(9) by

18   "advertising goods or services with intent not to sell them as advertised[.]"

19   192.   Defendants violated Tex. Bus. & Com. Code § 17.46(b)(13) by

20   "knowingly making false or misleading statements of fact concerning the need

21   for parts, replacement, or repair service[.]"

22   193.   Defendants violated Bus. & Com. Code § 17.46(b)(24) by "failing

23   to disclose information concerning goods or services which was known at the

24   time of the transaction if such failure to disclose such information was intended

25   to induce the consumer into a transaction into which the consumer would not

26   have entered had the information been disclosed[.]"

27   194.   Defendants violated all of the above provisions by advertising the

28

1  Class Vehicles as having a 17.1 gallon fuel tank whose full capacity can be used,

2  despite knowing of the Defect, failing to disclose the Defect, and having no

3  repair for the Defect.

4  195.   Defendants committed unconscionable, deceptive and unfair trade

5  practices, including, but not limited to, deception, fraud, false pretense, false

6  promise, misrepresentation and the knowing concealment, suppression and

7  omissions of materials facts concerning the Class Vehicles' Fuel Tank Defect

8  and corresponding safety risk with the intent that Texas Plaintiff and members of

9  the Texas Sub-Class would rely upon their misstatements and omissions in

10  connection with the sale and/or advertisement of Class Vehicles.

11  196.   Defendants fraudulently, intentionally, negligently and/or recklessly

12  misrepresented to Texas Plaintiff and members of the Texas Sub-Class the

13  characteristics of the Class Vehicles' fuel systems with respect to materials,

14  manufacture, durability, design, capacity, and longevity.

15  197.   Defendants knew or should have known that Texas Plaintiff and

16  members of the Texas Sub-Class would, in the course of their decision to expend

17  money in purchasing, leasing, and/or repairing Class Vehicles, reasonably rely

18  upon the misrepresentations, misleading characterizations and material

19  omissions concerning the quality of the Class Vehicles' fuel systems with respect

20  to materials, workmanship, design, manufacture, and information in the owner's

21  manuals.

22  198.   Information regarding the Fuel Tank Defect is material to

23  consumers in that the defect poses a safety risk and is directly related to the fuel

24  efficiency and range of the Class Vehicles, which is why consumers purchase

25  hybrid vehicles.

26  199.   Defendants violated the TDTPCPA by failing to inform Class

27  Vehicles owners and lessees prior to purchase and/or lease, or during the

28

warranty period, that Class Vehicles' fuel system were defectively design and/or manufactured and were accompanied by misstatements about the fuel capacity of the fuel tank.

200.   Defendants violated the TDTPCPA by failing to inform Class Vehicle owners prior to purchase and/or during the warranty period that Class Vehicles' fuel systems contained defects and would require replacement of expensive components.

201.   As a proximate and direct result of Defendants' unfair and deceptive trade practices, Texas Plaintiff and members of the Texas Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm.

202.   Texas Plaintiff and members of the Texas Sub-Class experienced the Fuel Tank Defect, monetary damages in the form of the premium they paid for hybrid vehicles which were held out to be efficient, operable and safe vehicles, diminution of Class Vehicle resale, and other substantial damages and inconvenience.

203.   The conduct of Defendants offends public policy as established by statutes and common law, is immoral, unethical, oppressive and/or unscrupulous and caused unavoidable and substantial injury to Class Vehicles owners and lessees, who were unable to have reasonably avoided the injury due to no fault of their own) without any countervailing benefits to consumers.

204.   Texas Plaintiff and members of the Texas Sub-Class demand judgment against Defendants for restitution, disgorgement, statutory and actual monetary damages, including multiple damages, interest, costs, and attorneys' fees and injunctive relief, including a declaratory judgment and an appropriate court order prohibiting Defendants from further deceptive acts and practices as described herein.

2758. On June 8, 2021, Texas Plaintiff sent a letter complying with Tex.

Bus. & Com. Code § 17.505(a). If Toyota fails to remedy its unlawful conduct within the requisite time period, Texas Plaintiff and the Texas Sub-Class Members intend to seek all relief to which they are entitled.

**SEVENTH CAUSE OF ACTION**

**BREACH OF IMPLIED WARRANTY**

**(By Texas Plaintiff on behalf of the Texas Sub-Class**

**against All Defendants)**

205.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 122, *supra*.

206.    Texas Plaintiff brings this cause of action individually and on behalf of members of the Texas Sub-Class.

207.    Toyota is and was at all relevant times a "merchant" with respect to motor vehicles under Tex. Bus. & Com. Code §§ 2.104(1) and 2A.103(a)(20), and a "seller" of motor vehicles under § 2.103(a)(4).

208.    With respect to leases, Toyota is and was at all relevant times a "lessor" of motor vehicles under Tex. Bus. & Com. Code § 2A.103(a)(16).

209.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Tex. Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

210.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Tex. Bus. & Com. Code §§ 2.314 and 2A.212.

211.    Toyota provided Texas Plaintiff and Texas Sub-Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable, pass without objection in the trade, are fit for the ordinary purposes for which they were sold, are adequately labeled, and conform to the promises and affirmations on the label.  However, the Class Vehicles are not merchantable because they are not fit for their ordinary purpose of providing

reasonably reliable and safe transportation because, *inter alia*, the Class Vehicles and their fuel systems suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.  The Class Vehicles would not pass without objection in the trade, are not adequately labeled and do not comfort the promises and affirmations on the label because the fuel capacity of the Class Vehicles is not 17.1 gallons and the range of the Class Vehicle does not approach 615 miles as a result.

212.   Toyota impliedly warranted that the Class Vehicles were of merchantable quality and fit for their intended use.  This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their fuel systems, which were manufactured, supplied, distributed, and/or sold by Toyota, would provide safe and reliable transportation; (ii) a warranty that the Class Vehicles and their fuel systems would be fit for their intended use; (iii) that the Class Vehicles and their fuel systems would pass without objection in the trade; (iv) that Class Vehicles are adequately labeled; and (v) that Class Vehicles would conform the promises and affirmations on their labels.

213.   Toyota impliedly warranted that the Class Vehicles were fit for their particular purpose of providing the fuel efficiency and range expected of a hybrid vehicle with a 17.1 gallon fuel tank.  Toyota knew that Texas Plaintiff and Texas Sub-Class had reason to know that the Class Vehicles were required for this particular purpose.  Toyota also knew that Texas Plaintiff and Texas Sub-Class relied on Toyota's skill and judgment to furnish goods suitable for this purpose.

214.   As discussed in detail *supra* at ¶¶ 97-103, privity of contract is not required in this case, because Plaintiffs and Class Members are intended third-party beneficiaries of contracts between TMS and its dealerships; specifically,

they are the intended beneficiaries of Defendants' implied warranties. Toyota's vehicles are sold to consumers through a network of TMS's authorized dealerships, who are TMS's agents for sales and repairs. The dealers were not intended to be the ultimate consumers of the Class Vehicles, and the warranty agreements were designed for and intended to benefit the ultimate consumers only.

215.   Contrary to the applicable implied warranties, the Class Vehicles and their fuel systems at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Texas Plaintiff and Texas Sub-Class Members with reliable, durable, and safe transportation, would not pass without objection in the trade, were not adequately labeled, did not conform to the promises and affirmation on their labels, and were not fit for their particular purpose of providing enhanced fuel efficiency and range.  Instead, the Class Vehicles are defective, including the defective fuel systems.

216.   Plaintiffs and members of the Class have had sufficient direct dealings with either Toyota or its agents (dealerships and technical support) to established privity of contract between Toyota, on one hand, and Plaintiffs and each of the other Class Members on the other hand.  Nonetheless, privity is not required here because Plaintiffs and each of the other Class Members are intended third-party beneficiaries of contracts between Toyota and its distributors and dealers, and specifically, of Toyota's implied warranties.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

217.   The alleged Fuel Tank Defect is inherent and was present in each Class Vehicle at the time of sale.

218.   Because of Toyota's breach of the applicable implied warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, because of the Fuel Tank Defect, Texas Plaintiff and Texas Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' fuel systems are substantially certain to fail before the end of their design life.

219.   Toyota's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of Tex. Bus. & Com. Code §§ 2.314 and 2A.212.

220.   As a direct and proximate result of Defendants' breach of the implied warranties of merchantability and fitness for particular purpose, Texas Plaintiff and members of the Texas Sub-Class have been damaged in an amount to be proven at trial.

**TENTH CAUSE OF ACTION**

**BREACH OF EXPRESS WARRANTY**

**(By Texas Plaintiff on behalf of the Texas Sub-Class against TMS)**

221.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 122, *supra*.

222.   Texas Plaintiff brings this cause of action individually and on behalf of members of the Texas Sub-Class.

223.   TMS is and was at all relevant times a "merchant" with respect to motor vehicles under Tex. Bus. & Com. Code §§ 2.104(1) and 2A.103(a)(20), and a "seller" of motor vehicles under § 2.103(a)(4).

224.   With respect to leases, TMS is and was at all relevant times a "lessor" of motor vehicles under Tex. Bus. & Com. Code § 2A.103(a)(16).

225.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Tex. Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

226.   TMS provided all purchasers and lessees of the Class Vehicles with an express warranty described *infra*, which became a material part of the bargain. Accordingly, TMS's express warranty is an express warranty under Texas law.

227.   The fuel systems were manufactured and/or installed in the Class Vehicles by TMS and are covered by the express warranty.

228.   In a section entitled "What is Covered," TMS's express warranty provides in relevant part that "[t]his warranty covers repairs and adjustments needed to correct defects in materials or workmanship of any part supplied by Toyota."

229.   According to TMS, the Basic Warranty coverage for Toyota models "is for 36 months or 36,000 miles, whichever occurs first…" The Powertrain warranty coverage "is for 60 months or 60,000 miles, whichever occurs first." Further, there is a Hybrid System Warranty for 96 months or 100,000 miles for 2019 Class Vehicles and a Hybrid System Warranty for 10 years or 150,000 miles for 2020 Class Vehicles.

230.   TMS breached the express warranties by selling and leasing Class Vehicles with fuel systems that were defective, requiring repair or replacement within the warranty period, and refusing to honor the express warranty by repairing or replacing, free of charge, the defective fuel system and/or its defective components. In addition, when TMS did agree to pay a portion of the costs, TMS nevertheless breached the express warranty by simply replacing Plaintiffs' and Class Members' defective fuel system components with similarly defective fuel system components, thus failing to "repair" the Fuel Tank Defect.

231.   Plaintiffs and members of the Class have had sufficient direct dealings with either TMS or its agents (dealerships and technical support) to established privity of contract between TMS, on one hand, and Plaintiffs and

each of the other Class Members on the other hand.  Nonetheless, privity is not required here because Plaintiffs and each of the other Class Members are intended third-party beneficiaries of contracts between TMS and its distributors and dealers, and specifically, of TMS's express warranties.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

232.   Texas Plaintiff was not required to notify TMS of the breach or were not required to do so because affording TMS a reasonable opportunity to cure its breach of written warranty would have been futile. TMS was also on notice of the Fuel Tank Defect from its own pre-production testing, from the early complaints and service requests it received from Class Members, from repairs and/or replacements of fuel system components, and from other internal sources.

233.   TMS was further provided notice of its breach of express warranties by Texas Plaintiff by letter dated June 8, 2021.  Texas Plaintiff also provided notice of express warranties when he took his Class Vehicle to Fox Toyota, a Toyota-authorized provider of warranty repairs.  Despite these notices, TMS failed to cure the breach of express warranties within an adequate time.

234.   As a direct and proximate cause of TMS's breach of express warranties, Texas Plaintiff and the Texas Sub-Class have suffered, and continue to suffer, damages, including economic damages at the point of sale or lease. Additionally, Texas Plaintiff and the Texas Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

235.   Texas Plaintiff and the Texas Members seek full compensatory damages allowable by law, attorneys' fees, costs, punitive damages, restitution, the repair or replacement of all class vehicles, the refund of money paid to own

or lease all class, and appropriate equitable relief including injunctive relief, a declaratory judgment, and a court order enjoining TMS's wrongful acts and practices, and any other relief to which Texas Plaintiff and the Texas Sub-Class Members may be entitled.

**EIGHTH CAUSE OF ACTION**

**VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT FOR BREACH OF EXPRESS WARRANTIES,**

**15 U.S.C. § 2303 *ET SEQ*.**

**(By Plaintiffs on behalf of the Class against TMS)**

236.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 122, *supra*.

237.   Plaintiffs bring this cause of action on behalf of themselves and the Class against TMS, or, alternatively, Plaintiffs Cheryl and Paulo Tavares bring this cause of action individually and on behalf of the California Sub-Class, and Charles Deffendall brings this cause of action individually and on behalf of the Texas Sub-Class.

238.   The Class Vehicles are a "consumer product" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

239.   Plaintiffs and Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

240.   TMS is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

241.   TMS's express warranty is a "written warranty" within the meaning of 15 U.S.C. § 2301(6).

242.   As set forth *supra* and incorporated by reference, TMS provided a 36-month, 36,000-mile Basic Warranty, a 60-month, 60,000 mile Powertrain Warranty, and a 96-month, 100,000 mile Hybrid System Warranty for 2019

Class Vehicles and a 10 year, 150,000 mile Hybrid System Warranty for 2020 Class Vehicles.

243.   TMS breached the express warranties by selling and leasing Class Vehicles with the Fuel Tank Defect, requiring repair or replacement within the warranty period, and refusing to honor the express warranty by repairing or replacing, free of charge, fuel system components that contribute to the Fuel Tank Defect. In addition, when TMS did agree to pay a portion of the costs, Toyota nevertheless breached the express warranty by simply replacing Plaintiffs' and Class Members' defective fuel system components with similarly defective fuel system components, thus failing to "repair" the defect.

244.   TMS's breach of the express warranties has deprived the Plaintiffs and Class members of the benefit of their bargain by failing to provide Class Vehicles with an actual fuel capacity of 17.1 gallons as advertised.

245.   Plaintiffs and members of the Class have had sufficient direct dealings with either TMS or its agents (dealerships and technical support) to established privity of contract between TMS, on one hand, and Plaintiffs and each of the other Class Members on the other hand.  Nonetheless, privity is not required here because Plaintiffs and each of the other Class Members are intended third-party beneficiaries of contracts between TMS and its distributors and dealers, and specifically, of TMS's express warranties.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

246.   Affording TMS a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile. At the time of sale or lease of each Class Vehicle and all relevant times thereafter, TMS knew or was reckless in not knowing, of the lack of truth in their statements about the fuel

capacity and concomitant range of the Class Vehicles, of the material omissions concerning the standard, quality or grade of the Class Vehicles and the presence of the Fuel Tank Defect and associated safety risk, but failed to repair or replace the defective fuel system and/or disclose the defect. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford TMS additional reasonable opportunities to cure its breach of warranties is excused and thereby is deemed satisfied.

247.   Plaintiffs and members of the Class would suffer economic hardship if they returned their Class Vehicles, but did not receive the return of all payments made by them to TMS and/or their agents.  Thus, Plaintiffs and members of the Class have not re-accepted their Class Vehicles by retaining them.

248.   TMS was provided notice by letters dated June 8, 2021 that Plaintiffs would pursue a claim under the MMWA on behalf of a class.

249.   The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum or value of $25,000.  In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

250.   TMS has been afforded a reasonable opportunity to cure its breach, including when Plaintiffs and Class Members brought their vehicles in for diagnoses and repair of the defective fuel systems.

251.   As a direct and proximate cause of TMS's breach of written warranties, Plaintiffs and Class Members sustained and incurred damages and other losses in an amount to be determined at trial. TMS's conduct damaged Plaintiffs and Class Members, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, costs,

1  attorneys' fees, and/or other relief as appropriate.

2  ### NINTH CAUSE OF ACTION

3  ### VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT

4  ### FOR BREACH OF IMPLIED WARRANTIES,

5  ### 15 U.S.C. § 2303 *et seq*.

6  **(By Plaintiffs on behalf of the Class against All Defendants)**

7  252.   Plaintiffs incorporate by reference the allegations contained in

8  paragraphs 1 through 122, *supra*.

9  253.   Plaintiffs bring this cause of action on behalf of themselves and the

10  Class against all Defendants.

11  254.   The Class Vehicles are a "consumer product" within the meaning of

12  the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

13  255.   Plaintiffs and Class Members are "consumers" within the meaning

14  of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

15  256.   Defendants are "suppliers" and "warrantors" within the meaning of

16  the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

17  257.   Toyota provided Plaintiffs and the Class with an implied warranty

18  that the Class Vehicles and their components and parts are merchantable, pass

19  without objection in the trade, are fit for the ordinary purposes for which they

20  were sold, are adequately labeled, and conform to the promises and affirmations

21  on the label.  However, the Class Vehicles are not merchantable because they are

22  not fit for their ordinary purpose of providing reasonably reliable and safe

23  transportation because, *inter alia*, the Class Vehicles and their fuel systems

24  suffered from an inherent defect at the time of sale and thereafter and are not fit

25  for their particular purpose of providing safe and reliable transportation.  The

26  Class Vehicles would not pass without objection in the trade, are not adequately

27  labeled and do not comfort the promises and affirmations on the label because

28

the fuel capacity of the Class Vehicles is not 17.1 gallons and the range of the Class Vehicle does not approach 615 miles as a result.

258.   Toyota impliedly warranted that the Class Vehicles were of merchantable quality and fit for their intended use.  This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their fuel systems, which were manufactured, supplied, distributed, and/or sold by Toyota, would provide safe and reliable transportation; (ii) a warranty that the Class Vehicles and their fuel systems would be fit for their intended use; (iii) that the Class Vehicles and their fuel systems would pass without objection in the trade; (iv) that Class Vehicles are adequately labeled; and (v) that Class Vehicles would conform the promises and affirmations on their labels.

259.   Toyota impliedly warranted that the Class Vehicles were fit for their particular purpose of providing the fuel efficiency and range expected of a hybrid vehicle with a 17.1 gallon fuel tank.  Toyota had reason to know that the Class Vehicles were required by Plaintiffs and the Class for this particular purpose because the Class Vehicles are hybrids and are purchased for fuel efficiency and range.  Toyota also knew that Plaintiffs and the Class relied on Toyota's skill and judgment to furnish goods suitable for this purpose.

260.   Contrary to the applicable implied warranties, the Class Vehicles and their fuel systems at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation, would not pass without objection in the trade, were not adequately labeled, did not conform to the promises and affirmation on their labels, and were not fit for their particular purpose of providing enhanced fuel efficiency and range.  Instead, the Class Vehicles are defective, including the defective fuel systems.

261.   Defendants' breach of implied warranties has deprived Plaintiffs

and Class Members of the benefit of their bargain by failing to provide Class Vehicles with an actual fuel capacity of 17.1 gallons.

262.   Plaintiffs and members of the Class have had sufficient direct dealings with either Toyota or its agents (dealerships and technical support) to established privity of contract between Toyota, on one hand, and Plaintiffs and each of the other Class Members on the other hand.  Nonetheless, privity is not required here because Plaintiffs and each of the other Class Members are intended third-party beneficiaries of contracts between Toyota and its distributors and dealers, and specifically, of Toyota's implied warranties.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

263.   Affording Defendants a reasonable opportunity to cure their breach of implied warranties would be unnecessary and futile. At the time of sale or lease of each Class Vehicle and all relevant times thereafter, Defendants knew or were reckless in not knowing, of the lack of truth in their statements about the fuel capacity and concomitant range of the Class Vehicles, of the material omissions concerning the standard, quality or grade of the Class Vehicles and the presence of the Fuel Tank Defect and associated safety risk, but failed to repair or replace the defective fuel system and/or disclose the defect. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford Defendants additional reasonable opportunities to cure its breach of warranties is excused and thereby is deemed satisfied.

264.   Plaintiffs and members of the Class would suffer economic hardship

if they returned their Class Vehicles, but did not receive the return of all payments made by them to Defendants and/or their agents.  Thus, Plaintiffs and members of the Class have not re-accepted their Class Vehicles by retaining them.

265.   Defendants were provided notice by letters sent to TMS dated June 8, 2021 that Plaintiffs would pursue a claim under the MMWA on behalf of a class.

266.   The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum or value of $25,000. In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

267.   Defendants have been afforded a reasonable opportunity to cure its breach, including when Plaintiffs and Class Members brought their vehicles in for diagnoses and repair of the Fuel Tank Defect.

268.   As a direct and proximate cause of Defendants' breach of implied warranties, Plaintiffs and Class Members sustained and incurred damages and other losses in an amount to be determined at trial. Defendants' conduct damaged Plaintiffs and Class Members, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, costs, attorneys' fees, and/or other relief as appropriate.

269.   Because of Defendants' violations of the Magnuson-Moss Warranty Act as alleged herein, Plaintiffs and Class Members have incurred damages.

## RELIEF REQUESTED

270.   Plaintiffs, on behalf of themselves and all others similarly situated, request the Court to enter judgment against Defendants, as follows:

(a)     An order certifying the proposed Class and Sub-Classes, designating Plaintiffs as named representative of the Class,

and designating the undersigned as Class Counsel;

(a)     A declaration that Defendants are financially responsible for notifying all Class Members about the defective nature of the of the fuel system, including the need for repairs;

(b)     An order enjoining Defendants from further deceptive distribution, sales, and lease practices with respect to Class Vehicles; compelling Defendants to issue a voluntary recall for the Class Vehicles pursuant to 49 U.S.C. § 30118(a); compelling Defendants to remove, repair, and/or replace the Class Vehicles' defective fuel systems with suitable alternative product(s) that do not contain the defects alleged herein; enjoining Defendants from selling the Class Vehicles with the misleading information; and/or compelling TMS to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed;

(c)     A declaration requiring Defendants to comply with the various provisions of the Song-Beverly Act alleged herein and to make all the required disclosures;

(d)     A declaration requiring Defendants to comply with the various provisions of the state consumer protection statutes alleged herein and to make all the required disclosures;

(e)     An award to Plaintiffs and the Class for compensatory, exemplary, and statutory damages, including interest, in an amount to be proven at trial;

(f)     Any and all remedies provided pursuant to the Song-Beverly Act, including California Civil Code section 1794;

(g)   Any and all remedies provided pursuant to the Magnuson-Moss Warranty Act;

(h)   Any and all remedies provided pursuant to the state and federal consumer protection statutes herein alleged, including any applicable statutory and civil penalties;

(i)   Any and all remedies provided pursuant to the state warranty statutes herein alleged, including any applicable statutory and civil penalties;

(j)   A declaration that Defendants must disgorge, for the benefit of the Class, all or part of the ill-gotten profits it received from the sale or lease of its Class Vehicles or make full restitution to Plaintiffs and Class Members;

(k)   An award of attorneys' fees and costs, as allowed by law;

(l)   An award of attorneys' fees and costs pursuant to California Code of Civil Procedure § 1021.5;

(m)   An award of attorneys' fees and costs pursuant to the Texas Deceptive Trade Practices-Consumer Protection Act;

(n)   An award of pre-judgment and post-judgment interest, as provided by law;

(o)   Leave to amend the Complaint to conform to the evidence produced at trial; and

(p)   Such other relief as may be appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

271.   Plaintiffs demand a trial by jury of any and all issues in this action so triable.

Dated:  June 11, 2021

Respectfully submitted,

Capstone Law APC


By: /s/ Cody R. Padgett
Tarek H. Zohdy
Cody R. Padgett

BERGER MONTAGUE PC
Russell D. Paul (*Pro Hac Vice* to be filed*)*
Amey J. Park (*Pro Hac Vice* to be filed*)*
Abigail J. Gertner (*Pro Hac Vice* to be filed)
Natalie Lesser (*Pro Hac Vice* to be filed)
1818 Market Street
Suite 3600
Philadelphia, PA 19103
Tel:  (215) 875-3000
Fax:  (215) 875-4604
rpaul@bm.net
apark@bm.net
agertner@bm.net
nlesser@bm.net

Attorneys for Plaintiffs